439 Mass. 171 (2003)                                              171

Athol Daily News *v.* Board of Review of the Division of Employment and Training.

ATHOL DAILY NEWS *vs.* BOARD OF REVIEW OF THE DIVISION
OF EMPLOYMENT AND TRAINING & another.[1]

Franklin. March 6, 2003. - April 15, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Administrative Law,* Judicial review, Substantial evidence. *Employment Security,* Employment relationship, Judicial review.

This court concluded that the services performed by adult carriers who
delivered newspapers for a certain daily newspaper (employing entity) did
not constitute employment, that the carriers were independent contractors
and not "employees" within the meaning of G. L. c. 151A, and that
therefore, the carriers were not eligible for unemployment benefits under
c. 151A, where the employing entity was able to demonstrate, on the
undisputed facts presented at a hearing before a review examiner of the
board of review of the Division of Employment and Training, that the car-
riers, by picking up and delivering the newspapers however they wished,
were free from the control or direction of the employing entity; that the
carriers made deliveries outside of the premises owned by or the places of
business of the employing entity; and that the service provided by the car-
riers could be viewed as an independent trade or business, since the carri-
ers were capable of performing their services for anyone availing
themselves of the services. [176-183]

CIVIL ACTION commenced in the Orange Division of the District
Court Department on September 20, 2000.

The case was heard by *Thomas T. Merrigan,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Sheila L. York,* Assistant Attorney General, for the defendants.

*James E. Wallace, Jr. (Michael R. Bernardo* with him) for the
plaintiff.

*James C. Heigham,* for Massachusetts Newspaper Publishers
Association, amicus curiae, submitted a brief.

GREANEY, J. In this appeal, we consider whether adult carriers

[1]The deputy director of the division of employment and training.

who deliver newspapers for the Athol Daily News (News) are eligible for unemployment compensation benefits under G. L. c. 151A. A review examiner in the division of employment and training (division) concluded, after a hearing, that adult carriers were entitled to the benefits. The examiner's decision was entered as the decision of the division's deputy director, and the decision was affirmed by the board of review (board). The News sought judicial review in the District Court as provided in G. L. c. 151A, § 12. A judge in the District Court determined that the adult carriers were not entitled to benefits and reversed the board's decision. The deputy director appealed, and we transferred the case to this court on our own motion. We conclude that the adult carriers are not covered by G. L. c. 151A, and direct that a judgment be entered reversing the board's decision.

1. The undisputed facts are as follows. The News is a small newspaper company[2] that publishes its newspaper six times a week, Monday through Saturday. The newspapers are then distributed to subscribers within the News's circulation territory[3] by carriers, who pick up the newspapers either at the News's circulation room or at bundled drop points near the carriers' homes. The division conducted a random audit of the News's operations. At the time of the division audit, the News engaged twelve adult carriers, whom the News had retained after advertising available routes.

The News intended all carriers to be independent contractors. Each carrier entered into an Independent Newspaper Carrier Agreement (agreement) with the News to deliver the newspaper to subscribers each day, in good condition, not later than 4:30 P.M. on weekdays and 8:30 A.M. on Saturday. Pursuant to the agreement, carriers receive the names and addresses of subscribers on their route from the News. Carriers agree not to sell or give away the route, and not to give customer lists to anyone without permission from the News. Carriers may increase the

---

[2]The Athol Daily News is a division of Athol Press, Inc., a Massachusetts corporation with its principal place of business in Athol.

[3]The record indicates that the circulation territory of the Athol Daily News (News) includes the North Quabbin region, Athol, Orange, and other neighboring towns.

number of subscribers on their routes without permission, so long as a current list of all subscribers is kept and made available to the News on request. Carriers are free to engage in delivery services for entities other than the News. A carrier who cannot service his or her route for any reason must find a substitute carrier at his or her own expense.

Under the agreement, the News agrees to sell to the carrier newspapers required to be delivered to customers on the carrier's route at a wholesale price determined by the News. The News further agrees to notify the carrier of any changes in the wholesale price at least forty-eight hours prior to any change. Finally, the News agrees that, when monies are paid for advance subscriptions, the News will maintain complete records to ensure that carriers receive full credit for delivery. Carriers are paid based on the number of papers delivered. Although each carrier may establish the price charged to customers on the carrier's route, most, if not all, use the price suggested by the News. Customers either pay the News or the carrier directly for their newspapers. Prepaid customers, who make up the majority of the News's subscribers, pay the News directly and receive a reduced price. The News then refunds the carrier with credit for delivery of those newspapers. If a customer pays the carrier directly, the carrier then pays the News the wholesale rate for that customer's papers and pockets the difference.

In addition to home delivery, some carriers deliver bundles of newspapers to predetermined locations along their routes, to be picked up for subsequent delivery by youth carriers.[4] Some carriers also deliver newspapers to vending machines along their routes. The News pays carriers a set fee for each "bundle drop," and it reimburses carriers for mileage. The News prepares a statement each week, showing the carrier's previous balance, number of papers delivered that week, credits for bundle drops, store collection, mileage allowance, and tips. At the end of each

---

[4]This appeal does not involve the employment status of youth carriers. General Laws c. 151A, § 6, identifies numerous categories of service not included in the term "employment." Section 6 (*o*) expressly excludes from the statute's scope "[s]ervices performed by an individual under the age of eighteen in the delivery or distribution of newspapers or shopping news, not including delivery or distribution to any point for subsequent delivery or distribution."

week, either the carrier owes the News or the News provides the carrier with a refund. The News does not deduct any State or Federal taxes from the carrier's pay and issues no wage statements to the carriers for tax purposes at the end of the year.

The News employs a circulation manager who oversees carrier routes. Customers direct complaints regarding the delivery of newspapers to either the carrier or the News, and the News informs the carrier of any complaint received about him or her. Although the agreement provides that the carrier will notify the News at least two weeks in advance of the carrier's intention to terminate delivery services, both the News and the carrier may terminate the agreement without incurring any liability for breach of contract. The agreement expressly states that carriers are not employees of the publisher and disclaims responsibility on the part of the News for any liability that may arise during the performance of the carrier's route.

2. We review the decision of the board[5] according to the standards set forth in G. L. c. 30A, § 14 (7), giving "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." In addition, we are required to construe G. L. c. 151A liberally, in view of its overriding purpose "to lighten the burden which now falls on the unemployed worker and his family." G. L. c. 151A, § 74. See *Still* v. *Commissioner of the Dep't of Employment & Training*, 423 Mass. 805, 809 (1996). So long as the facts in the board's decision are supported by substantial evidence (a matter not in issue here) and the board utilizes the proper legal standards (a matter in issue), its decision will be upheld. See *Silva* v. *Director of the Div. of Employment Sec.*, 398 Mass. 609, 611 (1986); *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 372 Mass. 678, 685-686 (1977). We are not, however, bound by an erroneous construction of G. L. c. 151A. See *Johnson* v. *Martignetti*, 374 Mass. 784, 790 (1978).

---

[5]For purposes of this opinion, we will refer to the decision as that of the board of review (board). As indicated above, the board affirmed the decision of the deputy director, after considering the entire record, including the transcript of the hearing and the factual findings and legal conclusions of the review examiner who conducted the hearing.

General Laws c. 151A, § 2, provides that:

> "Service performed by an individual . . . shall be deemed to be employment[6] subject to this chapter irrespective of whether the common-law relationship of master and servant exists, unless and until it is shown to the satisfaction of the commissioner that —
>
> "(*a*) such individual has been and will continue to be free from control and direction in connection with the performance of such services, both under his contract for the performance of service and in fact; and
>
> "(*b*) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and
>
> "(*c*) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

An employment relationship thus exists, for purposes of G. L. c. 151A, unless it can be demonstrated that the services at issue are performed (a) free from control or direction of the employing enterprise; (b) outside of the usual course of business, or outside of all the places of business, of the enterprise; and (c) as part of an independently established trade, occupation, profession, or business of the worker. The employer bears the burden of proof, and, because the conditions are conjunctive, its failure to demonstrate any one of the criteria set forth in subsections (*a*), (*b*), or (*c*), suffices to establish that the services in question constitute "employment" within the meaning of G. L. c. 151A. See *Silva* v. *Director of the Div. of Employment Sec., supra* at 613-614. Conversely, an employing entity who successfully

---

[6]"Employment" is defined by G. L. c. 151A, § 1 (*k*), as "service, including service in interstate commerce, performed for wages or under any contract, oral or written, express or implied, by an employee for his employer as provided in this section and in sections two, three, four A, five, six and eight C."

meets the criteria of subsections (*a*), (*b*), and (*c*) establishes that the services do not constitute employment and, thus, the workers performing the services are independent contractors and not "employees"[7] within the meaning of G. L. c. 151A. This tripartite test is commonly known as the "ABC" test.

In this case, the board determined that the News had failed to meet its burden with respect to all three prongs of the ABC test. Based on the undisputed factual findings, the board concluded that the carriers "do not control the routes, accounts or subscribers list," and thus "do not have a proprietary interest . . . to the extent that he/she can operate [a delivery business] without a hindrance from any individual or force whatsoever." In addition, the board determined that the carriers performed services "in the usual course of [the News's] business and were not "free from [the News's] direction and control in connection with the performance" of these services. Based on these determinations, the board decided that the carriers are "employees" who perform services constituting "employment" within the meaning of G. L. c. 151A.[8] The judge reversed the board's decision, and the division appealed.

3. The question before the judge and before us is one of law, whether, on the undisputed facts, and consistent with the standards stated above, the News has demonstrated that the adult carriers are independent contractors under the ABC test. Based on our review of the record and consideration of the applicable principles of law, we conclude that the News has satisfied its burden.[9]

(a) The first part of the test examines the degree of control

---

[7]An "[e]mployee" is defined by G. L. c. 151A, § 1 (*h*), as "any individual employed by any employer subject to this chapter and in employment subject thereto."

[8]By this status determination, the News, among other requirements, would be responsible for contributions to the unemployment compensation fund based on payments made to adult carriers, and the adult carriers would be eligible to apply for unemployment benefits under the statute. See G. L. c. 151A, §§ 14, 22, 24.

[9]We reject the statutory argument set forth by the division of employment and training (division), that the explicit exclusion of youth carriers (under the age of eighteen) under G. L. c. 151A, § 6 (*o*), see note 4, *supra*, demonstrates a legislative intent to include adult carriers (over the age of eighteen) within the statute's scope. We read § 6 (*o*) as an unambiguous expression that

and direction retained by the employing entity over the services performed. Prior to 1971, this part was the sole standard of § 2, which read: "Service performed by an individual shall be deemed to be 'employment' unless and until it is shown to the satisfaction of the director that such individual has been and will continue to be free from control or direction by another with respect to the performance of such services, both under his contract of service and in fact." St. 1941, c. 685, § 1. This provision generally was construed according to the common-law analysis of master and servant relationship.[10] See *O'Malley's Case*, 361 Mass. 504, 505 (1972); *Brigham's Case*, 348 Mass. 140, 141-142 (1964) ("If in the performance of his work an individual is at all times bound to obedience and subject to direction and supervision as to details, he is an employee; but if he is only responsible for the accomplishment of an agreed result in an agreed manner, he is an independent contractor"). The essence of the distinction under common law has always been the right to control the details of the performance, see *McDermott's Case*, 283 Mass. 74, 76 (1933), and the freedom from supervision "not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work." *Maniscalco* v. *Director of the Div. of Employment Sec.*, 327 Mass. 211, 212 (1951), quoting *Griswold* v. *Director of the Div. of Employment Sec.*, 315 Mass. 371, 372-373 (1944). Contrary to the interpretation given by the

children are not to be deemed employees merely because they have a paper route before or after school, and, thus, are categorically exempt from the tripartite test of § 2. Moreover, if the list of workers exempt from the definition of "employment" under § 6 were considered to be exclusive, the case-by-case approach provided by § 2 would be unnecessary.

We likewise are unpersuaded by the division's argument that the Legislature's failure to adopt an exemption for adult newspaper carriers similar to that under the Federal Unemployment Tax Act, 26 U.S.C. § 3306 (c)(15)(B) (2000), indicates a deliberate choice by the Legislature that there be no corresponding exclusion under G. L. c. 151A.

[10]It should be noted that, while under the common-law test for employment, the degree of control is the dominant factor, for purposes of the "ABC" test, it carries no more weight than the other two factors that are to be considered. Thus, notwithstanding that the worker could be considered an independent contractor under common law, the worker may still be deemed an employee for purposes of G. L. c. 151A under § 2.

board, the test is not so narrow as to require that a worker be entirely "free from direction and control from outside forces."

Here, the agreement requires only that the newspapers be delivered in good condition and before a certain time each day. Beyond those requirements, the performance of a carrier's delivery service is completely within the carrier's decision. Carriers may deliver on foot, by bicycle, automobile, motorcycle, or otherwise. They are free to adopt any manner of dress or wrap the newspapers in any way. They may agree to perform services for their customers other than the delivery of newspapers and to charge separately for these services. Without approval from the News, they may expand the number of customers on their routes or be assisted by anyone in the delivery of the newspapers. In fact, once carriers receive their newspapers from the News, they are entirely free from its supervision in performing the services for which they were engaged.

Factors relied on by the board in considering this part — that the suggested manufacturer's price of the newspapers is determined by the News; that subscribers may complain directly to the News if dissatisfied with a carrier's performance; that the circulation manager is responsible for the carriers; and that the News may terminate the carrier agreement at any time — go to the carriers' relationship with the News and are not indices of control over the details of the carriers' performance as contemplated by § 2 (*a*). The record demonstrates that the carriers pick up and deliver the newspapers however they wish. As found by the board, "[t]he mode, manner and means of delivery are up to the carrier." That is enough to satisfy part (a) of the ABC test.

(b) The second part of the test involves two separate criteria, and, if the employer demonstrates either, part (b) will be met. The question asked is whether the services are performed outside of the usual course of business of the enterprise or whether the services are performed outside of all the places of business of the enterprise. The board considered only the former criteria and, because it determined that the carriers' services were performed "in the usual course of the employer's business," concluded that the News had failed this part of the test.

In light of the fact that the News itself defines its business as "publishing and distributing" a daily newspaper, we agree that the carriers' services are performed in "the usual course of [the News's] business." See *Mattatuck Museum-Mattatuck Historical Soc'y* v. *Administrator, Unemployment Compensation Act,* 238 Conn. 273, 280 (1996) (art instructor services performed "on a regular or continuous basis" within art museum); *Bigfoot's, Inc.* v. *Board of Review of the Indus. Comm'n of Utah,* 710 P.2d 180, 181 (Utah 1985) (musicians performed "usual and customary" activity of beer bar); *Yurs* v. *Director of Labor,* 94 Ill. App. 2d 96, 104 (1968) (organist played music as "usual part of" funeral home's business).

The board erred, however, in failing to consider the second component of the either-or test, which, on these facts, is easily met. The record demonstrates that, although carriers may pick up newspapers at the company's distribution center, most newspapers are delivered from house to house on a public route within one or more local communities. Other newspapers are delivered to bundle drops, stores, and vending machines. It is clear that all of the carriers make deliveries outside of premises owned by the News or which could fairly be deemed its "places of business." It is this type of inquiry that is contemplated by the second prong of part (b).[11]

(c) The third part of the test asks whether the worker is "customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." The division asserts that this language requires proof that a carrier's delivery services

---

[11]The division's assertion that the News's "places of business," for purposes of the second part of the ABC test, includes the geographic area tracked by all of the News's delivery routes, is illogical. The one decision cited by the division in support of its position, *Richardson Bros.* v. *Board of Review of the Dep't of Employment Sec.,* 198 Ill. App. 3d 422 (1990), concerned truck drivers who distributed garden plants to retail outlets, and not carriers who deliver newspapers to private homes. To the extent that language employed by the Illinois court suggests that a newspaper delivery route is a newspaper company's place of business for purposes of G. L. c. 151A, we respectfully disagree. See *id.* at 430, citing *Eutectic Welding Alloys Corp.* v. *Rauch,* 1 Ill. 2d 328 (1953) ("where an employing unit assigns a specific area to an individual for the purpose of selling its product . . . that area is the place of business of the enterprise").

constitute in fact an independently established enterprise capable of operating without the benefit of its relationship with the News, or another newspaper publishing company. The board's determination that the carriers are not engaged in such an enterprise was based on its finding that they "do not have a proprietary interest [in their delivery services] to the extent that he/she can operate without a hindrance from any individual or force whatsoever."[12] This legal standard, however, is far too stringent. Its literal application would deny independent contractor status to almost any worker whose trade, occupation, profession or business, although established and operated independently, remains economically viable solely because of its contractual relationships with other entities, and would render superfluous any examination of criteria set forth in part (a) (freedom from control over performance of services) or part (b) (performance of services outside the usual course or places of business) of the ABC test.[13]

---

[12]In support of its position, the division cites decisions from other jurisdictions interpreting identical, or nearly identical, provisions in other State unemployment compensation statutes. See *Clayton* v. *State*, 598 P.2d 84, 86-87 (Alaska 1979), quoting *Schuffenhauer* v. *Department of Employment Sec.*, 86 Wash. 2d 233, 238 (1975) (business must establish "enterprise created and existing separate and apart from the relationship with the particular employer, an enterprise that will survive termination of that relationship"); *AFM Messenger Serv., Inc.* v. *Department of Employment Sec.*, 198 Ill. 2d 380, 401 (2001), quoting *Jack Bradley, Inc.* v. *Department of Employment Sec.*, 146 Ill. 2d 61, 78 (1991) ("employee's entrepreneurial enterprise must enjoy a 'degree of economic independence such that the enterprise could survive any relationship with the particular person contracting for services' "); *Lewiston Daily Sun* v. *Unemployment Ins. Comm'n*, 733 A.2d 344, 347 (Me. 1999) (must prove proprietary interest in occupation such that able to "operate without hindrance from any source"); *Matter of Hendrickson's Health Care Serv.*, 462 N.W.2d 655, 659 (S.D. 1990) ("calls for an enterprise created and existing separate and apart from the relationship with the particular employer; an enterprise that will survive the termination of that relationship"). These decisions may provide guidance but are not binding on this court.

[13]It is hardly remarkable that courts applying the above standard, see note 12, *supra*, almost invariably conclude that the employer has failed to carry its burden under part (c) of the ABC test. See, e.g., *Clayton* v. *State*, *supra* at 87 (log cutters harvesting timber on land owned by lumbermill not independent contractors); *AFM Messenger Serv., Inc.* v. *Department of Employment Sec.*, *supra* at 407 (drivers' delivery business not established independently of messenger service company); *Lewiston Daily Sun* v. *Unemployment Ins. Comm'n*, *supra* at 347-348 (newspaper reporter employee not customarily engaged in

The better approach to the evaluation required by part (c) is to consider whether the service in question could be viewed as an independent trade or business because the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services. As stated recently by the Appeals Court in *Boston Bicycle Couriers, Inc.* v. *Deputy Director of the Div. of Employment & Training*, 56 Mass. App. Ct. 473 (2002), part (c) "seeks to discern whether the worker is wearing the hat of an employee of the employing company, or is wearing the hat of his own independent enterprise." *Id.* at 480.

In *Boston Bicycle Couriers, Inc.* v. *Deputy Director of the Div. of Employment & Training*, *supra*, the Appeals Court affirmed a decision of the board that bicycle couriers were employees of a delivery business and not independent contractors under G. L. c. 151A, § 2. There, the plaintiff's business consisted entirely of the pick up and delivery of letters and packages on an on-call basis. The business thus was virtually indistinguishable from the services performed by the bicycle couriers themselves. See *id.* at 483 ("without delivery drivers . . . [the plaintiff's business] could not operate"). Due to the specialized nature of the plaintiff's business, the option of performing the same services for similar companies was, as a practical matter, unavailable to the bicycle couriers. See *id.* at 481. In addition, the record in that case showed that the plaintiff provided couriers with radios and pagers, purchased workers' compensation insurance for the couriers, and assumed the risk of loss for nonpayment of delivery charges. See *id.* at 482. None of the above factors that supported an employment relationship between the plaintiff and its bicycle carriers in the *Boston Bicycle Couriers* case, however, are present in this case.[14]

By its very nature, the business of delivering newspapers is

---

independently established trade for purposes of part [c] of ABC test); *Matter of Hendrickson's Health Care Serv.*, *supra* (nurses and nurse's aides providing in-home health care to business clients were employees of business).

[14]To meet its burden of proof under § 2 (*c*), Boston Bicycle Couriers, Inc. (BBC), had been required to demonstrate that: "(1) [the bicycle courier] customarily engaged in an independent courier delivery service on his own; (2) [his] courier delivery service operated wholly independently of his work

not limited to a single employer, and nothing with respect to the carriers' job performance in this case is unique to one certain newspaper publisher. The carriers use their own vehicles, not company vehicles, and are compensated for mileage. They are not paid an hourly wage, but purchase newspapers from the News and resell them to subscribers at (theoretically, at least) a price of their own choosing. Carriers may independently contract with subscribers to perform other tasks (such as bringing milk bottles to the customer's door) and may charge as they wish for those services.

It is significant that, regardless of whether carriers control their own routes, accounts, or subscribers list, the carriers are free to deliver newspapers (or other publications, such as advertising flyers) for anyone who wishes to contract with them, even competitors of the News. The record indicates that several of the carriers in fact act as carriers for other publishers and are paid on the basis of work performed for those publishers, without regard to their contractual obligations to the News. In determining that the carriers are not engaged in an independent business or trade, the board noted that none of the carriers advertised their delivery services. This observation misses the mark. The fact of the matter is that the carriers are free to advertise their delivery services, if they so desire, in an attempt to increase the number of subscribers on their routes or to acquire similar relationships with other publishing companies. The breadth of each carrier's delivery service is a function, not only of the original subscriber list given to the carrier by the News, but of the individual initiative of the carrier. See *Shoppers Guide* v. *South Dakota Dep't of Labor Unemployment Ins. Div.*, 551 N.W.2d 584, 587 (S.D. 1996). This in itself is compelling evidence that a carrier is an entrepreneur and performs his or her newspaper delivery service for the News in that capacity within the meaning of part (c).

---

for BBC; and (3) [his] business was established and running." *Boston Bicycle Couriers, Inc.* v. *Deputy Director of the Div. of Employment & Training*, 56 Mass. App. Ct. 473, 479 (2002). These requirements are unnecessarily rigid. Moreover, criteria based on the factual circumstances of each individual worker, rather than on the nature of the services performed, would have the anomalous result of inconsistent status determinations with respect to workers performing identical services for the same company.

The result we reach is consistent with decisions reached by other courts in analogous circumstances. See *id.* at 587-588 (applying two-part statutory test to determine that newspaper carriers were independent contractors and not employees of newspaper publisher); *Venango Newspapers* v. *Unemployment Compensation Bd. of Review*, 158 Pa. Commw. 379, 387-388 (1993) (same). But see *Times-Argus Ass'n* v. *Department of Employment & Training*, 146 Vt. 320, 323-324 (1985) (board's finding that drivers delivering newspapers on rural routes were newspaper employees not contrary to evidence).[15]

4. A judgment is to enter in the District Court reversing the decision of the board.

*So ordered.*

---

[15]Past decisions in which the division has determined, on facts similar to this case, that newspaper carriers are independent contractors, also are instructive, but not determinative. See Essex County Newspapers, No. 292334 (Jan. 24, 2001); Ottaway Newspapers, Inc., No. S-N0025 (Dec. 3, 1986). We note that these decisions were those of a review examiner that, unlike this case, were never adopted or affirmed by the board, which is bound by case law and by its own precedent, but not by prior decisions of a review examiner. See *Pizura* v. *Director of the Div. of Employment Sec.*, 331 Mass. 286, 291-292 (1954); *Potris* v. *Commissioner of the Dep't of Employment & Training*, 42 Mass. App. Ct. 735, 738 (1997).