Sikora, Mitchell J., J.
RULING
The court has considered the administrative record; the complaint for judicial review pursuant to Mass.R.Civ.P. 14(7); all memoranda of the parties in support of and in opposition to the plaintiffs motion for judgment on the pleadings; the oral arguments of counsel at hearing; and the docketed post-hearing letters of counsel.
The court ALLOWS the motion of plaintiff College News Service for judgment on the pleadings pursuant to Mass.R.Civ.P. 12(c) for the reasons discussed below.
ORDER FOR JUDGMENT
Final judgment shall now enter as follows. The court reverses the decision of the Department of Industrial accidents dated September 30, 2004; and declares that persons delivering newspapers by agreement with the plaintiff College News Service through July 18, 2004, constituted independent contractors and not employees of College News Service.
REASONING
Procedural History
College News Service (“CNS”) contracts with newspaper publishers to purchase newspapers at wholesale and to deliver those newspapers to retail customers in western Massachusetts. In order to meet its delivery responsibilities, CNS contracts with individuals to deliver the newspapers (“drivers” or “carriers”).
In 2003, Travelers Indemnity Company (‘Travelers”) issued an assigned risk workers’ compensation policy to CNS. Travelers concluded that the drivers were independent contractors and not employees of CNS because the drivers used their own vehicles, had independent contractor agreements with CNS, and were not directly controlled by CNS. On February 17, 2004, the Workers’ Compensation Rating and Inspection Bureau (“WCRIB”) notified Travelers that it considered the drivers to be employees of CNS and that the drivers needed to be included in the audit. CNS appealed WCRIB’s decision. A hearing ensued before a hearing officer of the Department of Industrial Accidents (“Department”). On September 30, 2004, he issued an adjudicatoiy decision of the Department. It affirmed WCRIB’s decision that the drivers were employees rather than independent contractors. Pursuant to G.L.c. 30A, §14(7)(c), (e), and (g), respectively, *465 CNA has appealed to the Superior Court from that decision upon grounds that it rests upon multiple errors of law; that it lacks the support of substantial evidence; and that it constitutes an abuse of discretion.
Factual Background
CNS delivers newspapers to and solicits subscriptions from home subscribers, residents of college dormitories, and individuals in commercial office spaces. James V. Riley is the sole proprietor of CNS. CNS’s current workers’ compensation policy covers its office workers at a yearly premium of $108. If its 42 drivers comprised additional employees, the yearly premium would approximate $15,692. CNS contracts with newspaper publishers, including the Boston Globe, New York Times, New York Post, Financial Times, Wall Street Journal, and USA Today. It purchases those newspapers from the publishers at negotiated wholesale prices and resells them to customers at retail prices.
An “Independent Contractor Distribution Agreement” (“the Agreement”) governs the relationship between CNS and each driver or carrier. The Agreement characterizes the drivers as non-employees. The drivers agree to deliver newspapers in safe and dry condition and in a timely manner. The drivers agree to deliver weekly and Saturday newspapers at any time between 12:30 a.m. and 7:00 a.m. and Sunday newspapers at any time between 1:00 a.m. and 8:00 a.m. They may choose the sequence and method of delivery. They must purchase their own supplies, such as rubber bands, to implement delivery. Each day they pick up the newspapers at CNS’s main distribution point in West Springfield and at other smaller “depots.” They deliver the papers to customers’ homes, dormitories, and places of business. They use their own vehicles of any type and must operate and maintain them at their own expense for fuel, repairs, and insurance. The drivers do not have permission to display the CNS logo on their vehicles.
The drivers receive no supervision in the course of their deliveries. They control the frequency and length of any work breaks. They need not maintain any communication with CNS during their work. They wear no uniforms.
The drivers receive no training from the company. They have no obligation to attend CNS meetings, to obey work rules, or to submit to drug testing. They have no contact with the company’s human resources personnel. They receive no office space nor any insurance benefits. They must carry their own liability insurance.
If a driver becomes ill or otherwise incapable of delivering newspapers, he or she must provide a substitute. The substitute does not require CNS’s ap-. proval. Drivers may use substitutes on a daily basis and independently determine their pay. If a driver cannot find a substitute to carry out the deliveries, CNS will carry them out and charge the driver the cost of that work. Also CNS will charge a carrier the cost of curing of a missed or defective delivery.
CNS compensates the drivers on a per-delivery basis. The company and the carrier may negotiate the rate of payment. The drivers are free to deliver other products during the course of their routes, including publications from other sources, as a means of increasing their earnings.
Some drivers do deliver competing publications for other contractors during the course of their routes. At least 8 of the 42 carriers have submitted affidavits to that effect, without objection between the parties. Supplemental Administrative Record. The rival publications include the Springfield Republican, Westfield. Evening News, Valley Advocate and the Berkshire Eagle.
The drivers are responsible for the payment of all federal and state income taxes, social security contributions, and unemployment taxes for themselves and for any of their substitute/helper carriers. They agree that they are ineligible for unemployment benefits.
If a customer complains, the driver is responsible for a response if he wishes to make one. At the same time, the company employs three individuals, known as “newspaper deliveiy coordinators,” to manage geographic areas of delivery and to monitor delivery service. If a driver fails to meet delivery obligations, the coordinator can arrange for redelivery of papers, can assess penalties against the driver’s compensation, and can terminate the Agreement with the driver for serious breaches. The company and the driver may independently terminate the Agreement by written notice.
Analysis
College News Service challenges the Department’s treatment of drivers as employees upon grounds of error of law under c. 30A, §14(7)(c), lack of support of substantial evidence under §14(7)(e), and abuse of discretion under §14 (7)(g). Original Memorandum at 1. The gravamen of its argument is that the Department has misconstrued and misapplied the governing statute, G.L.c. 149, §148B, as an error oflaw; and that in that process it has necessarily misread the evidence and abused its discretion. As is often the case, the subsections of §14(7) tend to overlap so that the violation of one statutory standard may constitute the violation of another.
Standard of Review
Some familiar canons of administrative law are at work in the present appeal. In the review of an agency adjudication, “the court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” G.L.c. 30A, §14(7). Elia v. Commissioner of Public Welfare, 412 Mass. 416, 420 *466 (1992). As the party challenging the administrative decision, CNS bears the burden of demonstrating its error. Merisone v. Board of Appeals on Motor Vehicle Liability Policies & Bonds, 27 Mass.App.Ct. 470, 474 (1989); Faith Assembly of God of South Dennis & Hyannis, Inc. v. State Building Code Commission, 11 Mass.App.Ct. 333, 334-35 (1981).
In the present appeal the evidence submitted at the administrative hearing is largely undisputed. The legal significance of the evidence is disputed. The issue is whether the correct application of G.L.c. 149, §148B to that evidence renders the newspaper delivery drivers as independent contractors exempt from workers compensation coverage or as employees covered by insurance and generating premiums for the contracting employer. It is essentially a question of statutory interpretation or law. It brings into play several other canons.
Agency interpretation of a statute will receive deference from the courts in accordance with the degree of (a) agency participation in the authorship or drafting of the enactment, (b) the duration of the agency’s interpretation, and (c) the consistency of its application of the statute since enactment. Board of Education v. Assessors of Worcester, 368 Mass. 511, 515-16 (1975) (cases collected). However, agency expertise or policy preference cannot alter the plain meaning of unambiguous statutory language. See especially Gordon & Son, Inc. v. Alcoholic Beverage Control Commission, 371 Mass. 584, 588-90 (1976) (authorities collected). (The courts cannot acquiesce in expedient enlargement of administrative authority or jurisdiction unsupported by statutory terms.)
An agency interpretation will require less weight if it is arising for the first time in the case at hand. Xtra, Inc. v. Commissioner of Revenue, 380 Mass. 277, 281-83 (1980). Deference for agency determinations is least necessary in a case reducing to a question of law rather than fact. Kelleher v. Personnel Administrator, 421 Mass. 382, 384 (1999); Space Building Corp. v. Commissioner of Revenue, 413 Mass. 445, 448 (1992); Buteau v. Norfolk County Retirement Board, 8 Mass.App.Ct. 391, 395 (1979).
If the Legislature uses the same language in several provisions concerning the same subject matter (e.g., the definition of an employee in distinction from an independent contractor), the courts will presume it to have given the language the same meaning in each provision. Commonwealth v. Germano, 379 Mass. 268, 275-76 (1979), and cases cited. Insurance Rating Board v. Commissioner of Insurance, 356 Mass. 184, 188-89 (1969); Lidell v. Standard Accident Ins. Co., 283 Mass. 340, 346 (1933); and Commonwealth v. Mercy Hospital, 364 Mass. 515, 520 (1974).
Application of the Statute
Throughout the pertinent time period, G.L.c. 151A, §2, defined “employment” for coverage of the workers compensation scheme in the following terms (emphasis supplied):
Service performed by an individual, . . . shall be deemed to be employment subject to this chapter irrespective of whether the common-law relationship of master and servant exists, unless and until it is shown to the satisfaction of the commissioner that
(a) such individual has been and will continue to be free from control and direction in connection with the performance of such services, both under his contract for the performance of service and in fact; and
(b) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and
(c) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.
By St. 2004, c. 193, §26, effective July 19, 2004, the Legislature deleted the second prong of subsection (b), le. the language “or is performed outside of all the places of business of the enterprise” so as to eliminate one element contributing to independent contractor status and concomitant exemption from coverage. The antecedent terms quoted above govern our case.
The ABC Test
In Athol Daily News v. Board of Review of the Div. of Employment & Training, 439 Mass. 171, 172 (2003), the Supreme Judicial Court analyzed whether newspaper deliverers were eligible for unemployment compensation benefits under G.L.c. 151A. Although the present case deals with workers compensation coverage pursuant to G.L.c. 149, §148B, the decision in Athol is instructive because G.L.c. 151A, §2, is almost identical to G.L.c. 149, §148B. Like the case at bar, Athol framed the question whether adult newspaper deliverers are employees of the distributor or independent contractors. Athol, 439 Mass. at 176.
An employment relationship thus exists . .. unless it can be demonstrated that the services at issue are performed (a) free from control or direction of the employing enterprise; (b) outside of the usual course of business, or outside of all the places of business, of the enterprise; and (c) as part of an independently established trade, occupation, profession, or business of the worker. The employer bears the burden of proof, and, because the conditions are conjunctive, its failure to demonstrate any one of the criteria set forth in subsections (a), (b), or (c), suffices to establish that the services in question constitute “employment” . . . [Citations omitted.] Conversely, an employing entity who successfully meets the criteria of subsections (a), (b), and (c), establishes that the services do not constitute employment, and, thus, the workers perform *467 ing the services are independent contractors and not “employees” ... This tripartite test is commonly known as the “ABC” test.
Athol 439 Mass. at 175-76.
In Athol the plaintiff was the Athol Daily News (“News”), a small newspaper company. It published its newspapers. Id. at 172. Carriers delivered them. They picked the papers up at distribution points or at the company’s circulation room. Id. The News employed 12 adult carriers, and it intended the carriers to be independent contractors. Id. Each carrier entered into an Independent Newspaper Carrier Agreement with the News; the agreement required the newspapers to be delivered in good condition and by a certain time each day. Id. “(O)nce carriers receive[d] their newspapers from the News, they [were] entirely free from its supervision in performing the services for which they were engaged.” Athol, 439 Mass. at 178. The court decided that the carriers’ ability to decide the time, manner, and means of delivery satisfied part (a) of the ABC test (i.e., the services at issue were performed free from control of the employing enterprise). Id.
The court held that the News would satisfy part (b) of the ABC test if it met either criterion (£.e., the services at issue were performed either outside of the usual course of business or outside of all the places of business of the News — the “either-or” test). Although the court agreed with the administrative agency that delivery of the newspapers lay within the usual course of business for the News because it defined its business as publishing and distributing a daily newspaper, it held that the administrative agency had erred because it had failed to consider the second part of the “either-or” test of part (b). Id. at 178-79. The court held that the News easily met the second component of part (b): the carriers performed their deliveries outside of all the places of business of the News. Id. at 179.
The court reduced part (c) of the test to the question
whether the service in question could be viewed as an independent trade or business because the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.
Athol 439 Mass. at 181. It distinguished the carriers in Athol from the bicycle carriers in Boston Bicycle Couriers, Inc. v. Deputy Director of the Division of Employment & Training, 56 Mass.App.Ct. 473, 481-83 (2002); by reason of the “specialized nature” of bicycle courier service, “the option of performing the same services for similar companies was, as a practical matter, unavailable to the bicycle couriers.” Athol 430 Mass. at 181.
In contrast, the carriers in Athol were free to deliver newspapers for multiple publishers, including competitors of the News. The record indicated that several of the News carriers did so. Id. at 182.
2. Application of the ABC Test Here
CNS has fulfilled the requirements of the ABC Test.
Part (a)
CNS has submitted sufficient evidence to satisfy part (a) of the ABC test. The degree of control withheld by CNS in the present case resembles the degree withheld by the News over its carriers in Athol. Like the carriers in Athol, the CNS drivers do not wear uniforms, do not drive company cars, and remain free to decide the order of their deliveries. Like the contract between the News and its carriers, the contracts between CNS and its drivers require only delivery in good condition by a certain time, and leave the drivers to decide the details of their performance.
Part (b)
CNS has met part (b) of the ABC test. CNS, like the News, does not satisfy the first component of part (b)’s “either-or” test. Because CNS’s entire business is distribution, delivering newspapers obviously is the usual course of CNS’s business. CNS, however, does satisfy the second alternative prong of the “either-or” test. The delivery of the newspapers takes place outside CNS’s places of business. The Athol court clearly decided that actual delivery routes are not among the usual places of business for a publisher of newspapers. Deliveries occurred “outside of premises owned by the News or which could fairly be deemed its "place of business." Athol, 439 Mass. at 179 & n.11.[1] Similarly here, deliveries to customers’ homes, dormitories, and offices obviously occur outside of premises owned by CNS or maintained by it as “places of business.”
Part (c)
CNS has fulfilled also the requirement of part (c) as refined by Athol whether the provider of the services in question “must depend on a single employer for the continuation of the services,” or whether the provider can perform them for “anyone working to avail themselves of the services." Id. at 181. The decision makes clear that a newspaper delivery person is typically free to extend service to multiple users rather than to an exclusive user resembling an employer. Id. at 181.
The record here shows that CNS permits its drivers to deliver publications for other companies in the very course of the routes undertaken for CNS. At least eight of its 42 carriers exercises that freedom. Supplemental Administrative Record. The drivers can function with the freedom of contractors rather than with the restrictions of workers for an exclusive employer.
Conclusion
The issue is one of law and not one of technical factfinding entrusted to administrative expertise. The Department cannot claim the deference due a contemporaneous or longstanding construction. Its decision *468 comprises a first construction clearly contradicted by a recent, conspicuous precedent. A closely fitting precedent construing nearly identical language in an analogous setting establishes plain meaning for the statute in the case at hand. The language simply will not bend far enough to accommodate the administrative decision. The error of law under c. 30A, §14(7)(c) requires reversal.

In this branch of his decision the Department hearing officer openly contradicted the specific reasoning of the SJC in Athol He characterized the delivery routes and their “doorway transactions” as CNS’s “places of business” because “[t]here is support in case law for the contention that the place of business for a distributor is where the performance of the contracted work begins. Eutectic Welding Alloys Corp. v. Rouch. 1 Ill.2d 328, 115 N.E.2d 898 (1953).” AR at 29-30.
In Athol the SJC specifically rejected the notion of the Eutectic Welding court that “where an employing unit assigns a specific area to an individual for the purpose of selling its product . . . that area is the place of business of the enterprise.” 439 Mass. at 179 n.11 (“respectfullydisagree[ing]”with the rationale of Eutectic and a later Illinois decision).