NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-655

ROMAN LEVIN

vs.

PURITAN DISTRIBUTION, INC.,[1] & others.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Roman Levin, filed an action, asserting,

inter alia, that the defendants, Puritan Distribution, Inc.,

doing business as North Shore Shuttle, Gina Walker, and Clinton

Walker (collectively, North Shore), misclassified him as an

independent contractor under G. L. c. 149, § 148B, and as a

result, failed to pay wages due to him in violation of the Wage

Act, G. L. c. 149, § 148.  The parties filed cross motions for

summary judgment.[3]  A Boston Municipal Court judge allowed North

_____

[1] Doing business as North Shore Shuttle.

[2] Gina Walker and Clinton Walker.

[3] Specifically, Levin moved for summary judgment on counts related to North Shore's alleged misclassification of him under G. L. c. 149, §§ 148B, 150; and nonpayment of wages under G. L.

Shore's motion for summary judgment and denied Levin's motion for partial summary judgment.  Levin appealed to the Appellate Division.  On April 15, 2025, a panel of the Appellate Division of the Boston Municipal Court Department affirmed.  We affirm.

Background.  1.  North Shore's business.  North Shore is a transportation services company offering shuttle bus, limousine, van, and car services out of Revere.  Customers reserve North Shore's services via a "web portal" or over the telephone. North Shore confirms reservations through an e-mail confirmation system.

In operating its business, North Shore employs "reservation/dispatch agents" who use radio, text, or a landline-to-text application to communicate with drivers. Employees are provided with an e-mail address -- consisting of their first name followed by "@BeDriven.com" -- and have access to the network to conduct their duties.  North Shore leases driving services -- i.e., its "drivers" -- from Driver Staffing Inc.  North Shore advertises its services over the Internet, contracting with a digital marketing agency to maintain its website, LinkedIn, Facebook, Pinterest, and Twitter pages.

---

c. 149, § 148.  North Shore moved for summary judgment on the same counts as Levin, as well as on a Levin's count alleging North Shore's failure to maintain proper payroll records and issue paystubs under G. L. c. 149, § 148.

2

2.  Levin's services.  Levin began providing information technology (IT) services for North Shore in 2003.[4]  For approximately the next fifteen years, North Shore engaged Levin intermittently, and on an as-requested basis, for services related to North Shore's computers, printers, Internet connection, and e-mail, radio, and telephone operations. Specifically, the record indicates that Levin assisted North Shore when the company's phone lines were disrupted, facilitated the creation of e-mail accounts for new employees, provided occasional technical training to North Shore's employees, and acted as an intermediary between North Shore and technology vendors, among other tasks.[5]  North Shore provided Levin with a business e-mail address to communicate internally with North Shore employees and externally with North Shore's vendors.

At all relevant times, North Shore compensated Levin at a rate of $65 per hour for standard work and $100 per hour for any work requiring immediate assistance.  The parties did not enter into any written agreements or contracts pertaining to Levin's

_____

[4] The parties do not dispute that Levin began working for North Shore as a driver in 2002, before transitioning to providing IT services in 2003.

[5] Other tasks included updating North Shore's phone system's firmware, mixing recordings for North Shore's customer-facing phone lines, and purchasing and taking inventory of radios.

3

performance of services, and North Shore did not issue Levin a W-2 wage statement or withhold taxes from Levin's compensation. Levin testified that he was available "on demand and daily," and the record reflects that his hours were dictated based on North Shore's needs. Levin kept track of his hours and tasks and submitted invoices to North Shore for payment.

Levin's work for North Shore was performed almost entirely remotely. On several occasions unrelated to his work, Levin traveled abroad for extended periods of time. Notably, Levin attended graduate school in Spain for approximately one year during which time he was available to perform IT services for North Shore.

3. Levin's misclassification claim. Relevant to the present action, between September of 2019 to January of 2020, Levin performed services for North Shore for which he alleged North Shore failed to make payments.[6] On January 21, 2020, Levin sent a letter to Gina and Clinton Walker, North Shore's chief executive officer and chief financial officer respectively, notifying the parties of the suspension of his services until he received payment. In the letter -- featuring a letterhead in which Levin referred to himself as an "Information Technology

---

[6] Levin's invoices indicate that he performed services for North Shore for approximately forty-eight of the eighty business days during this period.

4

Consultant" with a personal e-mail address -- Levin wrote, "We all understand how crucial your server is to your business, and I'm hoping we can achieve a resolution as soon as possible.  I know that you can appreciate that my IT services depend upon payment by my clients, just as your business does."  North Shore declined to make payment.

Discussion.  "We review the disposition of a motion for summary judgment de novo."  Barron Chiropractic & Rehabilitation, P.C. v. Norfolk & Dedham Group, 469 Mass. 800, 804 (2014).  Under the independent contractor statute within the Wage Act, G. L. c. 149, § 148B, "an individual performing any service is presumed to be an employee" (quotation and citation omitted).  Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 327 (2015).  A putative employer can rebut this presumption only by establishing all three of the factors set forth in G. L. c. 149, § 148B (a) (commonly referred to as the "ABC test"); namely that,

> "[1] the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact ['prong a']; and,

> "[2] the service is performed outside the usual course of the business of the employer ['prong b']; and,

> "[3] the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed ['prong c']."

5

See Somers v. Converged Access, Inc., 454 Mass. 582, 591 (2009) (characterizing ABC test as a "strict liability statute" notwithstanding whether employer's misclassification was in good or bad faith).

On appeal, Levin argues that the Boston Municipal Court judge erred in finding that North Shore met its burden as to each prong of the ABC test, and in concluding that he performed services for North Shore as an independent contractor. Based on the record, we disagree.

1. Control and direction. In determining whether an employer met its burden to establish that an individual was free from its "control and direction," we consider two primary factors: (1) the putative employer's right to control the details of the performance, and (2) the putative employee's freedom from supervision "not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work." Maniscalco v. Director of the Div. of Employment Sec., 327 Mass. 211, 212 (1951), quoting Griswold v. Director of Div. of Employment Sec., 315 Mass. 371, 372-373 (1944). See Athol Daily News v. Board of Review of the Div. of Employment & Training, 439 Mass. 171, 178 (2003) ("the test is not so narrow as to require that a worker

be entirely free from direction and control from outside forces" [quotation omitted]).

First, we note that the lack of a contract between Levin and North Shore in connection with his services disposes of the question whether North Shore expressly retained the right to control the details of Levin's performance. Thus, we turn to whether Levin was free from North Shore's control and direction as a matter of law. Levin argues that North Shore controlled his performance by "regularly direct[ing] [him] as to when to complete his work," pointing to communications where North Shore's officers asked for certain, discrete tasks to be completed "ASAP" or within a particular day. Although these communications indicate that North Shore, at times, prompted Levin's services based on its immediate business needs, they alone do not establish that North Shore directed the "means or methods" of Levin's work. See Athol Daily News, 439 Mass. at 178 (publisher's requirement that "newspapers be delivered in good condition and before a certain time each day" was, alone, insufficient to constitute control and direction over carriers' performance).

Rather, there is sufficient evidence to conclude, as a matter of law, that Levin performed his services free from North Shore's direction and control. Relevantly, the record indicates

7

that North Shore requested services but left Levin to determine the technical details required to achieve the result. Furthermore, that North Shore's officers requested updates from Levin regarding the status of tasks does not warrant a conclusion that he was subject to North Shore's "supervision," as Levin contends.

Additionally, at no time did North Shore provide Levin with any training, supplies, or equipment to perform his services. Contrast Weiss v. Loomis, Sayles & Co., 97 Mass. App. Ct. 1, 8 (2020) (employer provided technology services employee with work station, supplies, and equipment). There is also no evidence that North Shore set or limited Levin's hours, or that Levin's hours were subject to North Shore's supervision or approval. Contrast id. (employee submitted hours weekly for approval, which employer retained authority to supervise or limit).

Lastly, that Levin performed tasks for North Shore remotely while living abroad for a year and pursuing a graduate degree, evinces his freedom from North Shore's supervision. See Sebago, 471 Mass. at 332 (citing Attorney General advisory that "an independent contractor completes the job using his or her own approach with little direction and dictates the hours that he or she will work on the job" [emphasis added; citation omitted]). Contrast Weiss, 97 Mass. App. Ct. at 8 (employer "actively

8

supervised" employee's performance from "office directly across from [employee's] cubicle").

In sum, we conclude that North Shore met its burden in establishing that Levin was free from its control and direction.

2. Usual course of business. Next, in assessing whether Levin performed his services outside the usual course of North Shore's business, we consider (1) how North Shore defines its business, and (2) "whether the services [were] necessary or merely incidental to the business." Weiss, 97 Mass. App. Ct. at 8. See Carey v. Gatehouse Media Mass. I, Inc., 92 Mass. App. Ct. 801, 805-808 (2018). "[A] service need not be the sole, principal, or core product that a business offers its customers, or inherently essential to the economic survival of that type of business, in order to be furnished in the usual course of that business." Carey, supra at 808.

North Shore holds itself out as a business "providing transportation services for public and private organizations including airport, school, business and personal transport." Levin contends that the IT services he provided were "necessary" to North Shore's daily operations, and therefore, were performed in its usual course of business, despite North Shore's "core product or service" being that of transportation.

9

Levin relies heavily on Weiss, 97 Mass. App. Ct. at 9, where the defendant, a financial investment company, failed to establish that the plaintiff, a software engineer working in the "technology group," performed services outside of the company's usual course of business.  Notwithstanding the general similarity of services provided by the plaintiff in Weiss and Levin, Weiss is distinguishable.  In Weiss, the technology group provided full-time, continuous services to the company's investment professionals.  See id.  In contrast, Levin's services were provided only on North Shore's request, and even then, intermittently over the course of his engagement.  Additionally, whereas the company in Weiss publicly advertised the role the technology group played in the success of the business and included the group's accomplishments in annual reports to its board, the services Levin performed for North Shore were not publicized as a salient feature of the product North Shore delivered.  See id.  See also Athol Daily News, 439 Mass. at 179 (illustrating concept of services provided within employer's usual course of business with three examples:  art instructor providing services on "regular or continuous basis" within art museum; musicians performing as "usual and customary" activity of beer bar; and organist playing music as "usual part of" funeral home's business [citations omitted]).

10

Based on the relevant factors above, we conclude that North Shore met its burden in establishing that Levin's services were performed outside of the usual course of its business.

3. Independently established trade or business. Lastly, in determining whether Levin was "engaged in an independently established trade . . . or business of the same nature as that involved in the service performed," G. L. c. 149, § 148B (a) (3), we consider "whether the service in question could be viewed as an independent trade or business because the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services." Athol Daily News, 439 Mass. at 181. Put differently, we "seek[] to discern whether the worker is wearing the hat of an employee of the employing company, or is wearing the hat of his own independent enterprise." Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56 Mass. App. Ct. 473, 480 (2002).

The record indicates that Levin was free to perform IT services for others, as demonstrated by his own representations in his letter to North Shore in January of 2020. Within the correspondence Levin referred to himself as an "Information

11

Technology Consultant," and used language showing independence from North Shore, noting that he understood "how crucial your server is to your business," and that his "IT services depend[ed] upon payment by my clients, just as your business does" (emphasis added). Moreover, Levin took it upon himself to suspend services to North Shore -- an act entirely inconsistent with an employee. From this language, it is evident that Levin wore "the hat of his own independent enterprise," and was capable of performing his services to others. See Boston Bicycle Couriers, Inc., 56 Mass App. Ct. at 480.[7]

Levin contends that North Shore failed to meet its burden under prong c because it did not produce or identify evidence that demonstrated that Levin did, in fact, perform IT services for other businesses during his engagement with North Shore. This argument falls short, as the pertinent inquiry is not

_____

[7] Levin argues, relying on Somers, 454 Mass. at 591, that his "subjective belief" regarding whether he was classified as an independent contractor, as indicated by his language in the letter, is not relevant to the determination of the relationship between himself and North Shore. This argument misses the mark. Levin's letter not only indicated his subjective belief that he was providing services as an independent contractor, but also, that he was capable and free to perform such services to other "clients" of his own and that he held himself out to others as an independent contractor and was "capable of performing the service to anyone wishing to avail themselves of the services." Athol Daily News, 439 Mass. at 181. We therefore discern the letter's language to be relevant to whether North Shore met its burden under prong c.

12

whether Levin, in fact, performed IT services for others, but whether he was free and capable of doing so. See Athol Daily News, 439 Mass. at 182. See also id. at 180 (deeming "far too stringent" employment board's requirement that, to satisfy prong c, worker's services must "constitute in fact an independently established enterprise capable of operating without the benefit of its relationship" to putative employer). Given the "nature of the services" Levin performed for North Shore, we conclude that Levin was not "compel[led] . . . to depend on" North Shore "for the continuation of [his] services." Id. at 181. As discussed above, North Shore did not dictate or supervise Levin's hours, provided minimal guidelines as to the details of his work, and generally allowed Levin to perform his services with minimal supervision. Contrast Coverall N. Am., Inc. v. Commissioner of the Div. of Unemployment Assistance, 447 Mass. 852, 859 (2006) (affirming examiner's finding that worker was compelled to depend on employer for continuation of services where employer required worker provide, and adhere to, daily work plan, among other requirements); Weiss, 97 Mass. App. Ct. at 10 (employee was not free to provide services to other business where contract between employee and employer contained provision limiting employee's other employment insofar as it did not impair performance for employer).

We therefore conclude that North Shore met its burden in establishing that Levin was "engaged in an independently established trade . . . or business" under G. L. c. 149, § 148B (a) (3).

Conclusion.  For the foregoing reasons, we conclude that North Shore established, as a matter of law, that Levin performed services as an independent contractor.  We therefore affirm the Appellate Division's affirmance of the trial court's grant of summary judgment in North Shore's favor.[8]

Decision and order of
 Appellate Division
 affirmed.

By the Court (Meade,
 Hodgens & Allen, JJ.[9]),

Paul Little

Clerk

Entered:  May 5, 2026.

---

[8] Levin's request for attorney's fees is denied.

[9] The panelists are listed in order of seniority.