2007 VT 29

## Fleece on Earth v. Department of Employment and Training

[923 A.2d 594]

No. 05-367

Present: **Dooley, Johnson, Skoglund and Burgess, JJ., and Eaton, D.J., Specially Assigned**

Opinion Filed May 4, 2007

*Erin H. Gallivan* of *Meub Associates, Inc.*, Rutland, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Defendant-Appellee.

*John A. Facey, III* of *Kenlan, Schweibert & Facey, P.C.*, Rutland, and *Martin J. Newhouse* and *Andrew R. Grainger* of *New England*

*Legal Foundation,* Boston, Massachusetts, for Amici Curiae New England Legal Foundation and National Federation of Independent Business Legal Foundation.

¶ 1. **Skoglund, J.** Fleece on Earth (FOE) appeals from an Employment Security Board decision which held that the workers who make clothing for FOE are employees for purposes of assessing unemployment taxes on FOE. FOE contends that the Board erred in determining that the home knitters and sewers qualified as employees for this purpose. We affirm the decision while rejecting one part of the Board's analysis.

¶ 2. FOE is a children's wear company that retails children's clothing. FOE's owner designs all of the clothing sold by FOE. FOE's products are made by knitters and sewers who work at home and are paid by the piece. FOE provides the patterns and yarn for the knitters and patterns and pre-cut fabric for the sewers. The knitters and sewers work on their own machines, at their own pace. FOE sets the price per piece, but some workers have negotiated higher prices. Most of the sewers and knitters present FOE with a bill each month, detailing the number of items completed and how much FOE owes for the work. FOE retains the right to reject pieces that do not conform to its specifications.

¶ 3. The company came to the attention of the Department of Labor and Industry (the department) when one of FOE's knitters filed for unemployment benefits when she left another job. As part of the application process, she listed FOE as one of her employers. The department determined that FOE owed back taxes for its contract knitters and sewers. FOE contested the determination, and the case went to a hearing before an administrative law judge (ALJ). The ALJ upheld the department's assessment of contributions. FOE appealed to the Employment Security Board. The Board corrected the ALJ on one conclusion but affirmed the determination in all other respects. FOE appeals.

¶ 4. We review determinations by the Employment Security Board with a great degree of deference. The Board's decision is "entitled to great weight on appeal." *Cook v. Dep't of Employment & Training,* 143 Vt. 497, 501, 468 A.2d 569, 571 (1983). To the extent that the appeal challenges the Board's findings, the Court construes the record in a manner most favorable to the Board's conclusions, *Harrington v. Dep't of Employment Sec.,* 142 Vt. 340, 344, 455 A.2d 333, 336 (1982), and affirms the Board's findings if they are supported by credible evidence, "even if there is substantial evidence to the contrary." *Cook,* 143 Vt. at

501, 468 A.2d at 571. We must uphold the Board's judgment absent a clear showing that it is mistaken. *Bouchard v. Dep't of Employment & Training*, 174 Vt. 588, 589, 816 A.2d 508, 510 (2002) (mem.) (decisions within the Board's expertise "presumed to be correct, valid, and reasonable" absent "clear showing to the contrary").

## I.

¶ 5. This case illustrates the tension between the protection of unemployment compensation for workers and the economic realities faced by small businesses that utilize the services of home workers. We begin with a review of the purpose of Vermont's law on unemployment compensation. Chapter 17 of Title 21, Vermont's Unemployment Compensation Law, was first enacted in 1936. It is a remedial law, having benevolent objectives, and must be given liberal construction. *Littlefield v. Dep't of Employment & Training*, 145 Vt. 247, 253, 487 A.2d 507, 510 (1984); *Jones v. Dep't of Employment Sec.*, 140 Vt. 552, 554, 442 A.2d 463, 464 (1982). The law is designed "to remove economic disabilities and distress resulting from involuntary unemployment, . . . and to assist those workers who become jobless for reasons beyond their control." *Donahue v. Dep't of Employment Sec.*, 142 Vt. 351, 354, 454 A.2d 1244, 1246 (1982). Therefore, "no claimant should be excluded unless the law clearly intends such an exclusion." *Jones*, 140 Vt. at 554, 442 A.2d at 464.

¶ 6. In this case, no worker made a claim against FOE; rather, the department began an investigation pursuant to the powers bestowed in chapter 17 of Title 21, and made an assessment of contributions as provided in § 1330. It is the employer herein, FOE, who contests the applicability of the unemployment compensation law to its operations.

¶ 7. All persons who receive wages, as defined by 21 V.S.A. § 1301(12), from an employer, as defined by § 1301(5), are presumed to be employees under § 1301(6)(B) and are therefore entitled to unemployment benefits. There is no dispute in this case that FOE pays wages to the home knitters and sewers. To rebut this presumption, and avoid responsibility for unemployment compensation assessments, an employer must prove that its workers meet all three elements of the statutory exception commonly known as the ABC test. 21 V.S.A. § 1301(6)(B); *State v. Stevens*, 116 Vt. 394, 398, 77 A.2d 844, 847 (1951). The failure of any one part of the test compels the conclusion that an employer-employee relationship exists. *Vt. Inst. of Cmty. Involvement, Inc. v. Dep't of Employment Sec.*, 140 Vt. 94, 98, 436 A.2d 765, 767 (1981).

¶ 8. Section 1301(6)(B) of Title 21 describes the test:

> Services performed by an individual for wages shall be deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the commissioner that:
>
> (i) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and
>
> (ii) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

The language of this section has not changed since 1937.

¶ 9. As noted, the test is in the conjunctive, and thus, the "enterprise" must satisfy all three sections to avoid being subject to the requirements of the unemployment compensation law. *Stevens*, 116 Vt. at 397, 77 A.2d at 846. The Board found that, because FOE provides the patterns and material and may reject nonconforming products, the workers creating the products are subject to FOE's direction and control, and thus, FOE could not satisfy part A of the ABC test. The Board found that FOE had demonstrated that none of the workers worked in FOE's usual place of business, thus satisfying the second prong. With regard to the third prong, the Board determined that FOE could not prove that three of the six workers operated independently established businesses. Thus, the Board concluded that FOE failed to prevail on two of the three prongs of the ABC test.

## II.

¶ 10. In evaluating the first part of the test, the ALJ and the Board considered the amount of control FOE exercised over the final product. This, FOE argues, was in error. The statute states that the amount of "control or direction over the *performance* of such services" will determine whether the worker is an employee. 21 V.S.A. § 1301(6)(B)(i) (emphasis added). FOE argues that the workers are free to work whatever hours and days they choose, and they can work as much or as little as they want. FOE notes that all of the workers invested in their own equipment, and either trained themselves or received training from sources other than FOE. It argues that the fact that FOE

required the workers to conform to certain standards should not, in and of itself, turn them into employees rather than independent contractors. FOE contends that the Court should look to the common law master-servant guidelines to assist in determining when a worker is subject to an employer's direction and control. Without guidance from the common law, FOE asserts, there is simply no worker who is not an employee. FOE and the amici warn that the danger in this part of the test is that once an employer gives a worker any specific direction, the employer may become liable for unemployment taxes.

¶ 11. Part A of the test examines the degree of control and direction retained by the employing entity over the services performed. This Court has consistently held that the statutory scheme at issue here is broader than the common law master-servant relation, and it draws into its sweep workers who might be independent contractors under the common law. *Stevens*, 116 Vt. at 397-98, 77 A.2d at 847; see also *Bluto v. Dep't of Employment Sec.*, 135 Vt. 205, 208, 373 A.2d 518, 520 (1977); *Vt. Sec., Inc. v. Vt. Unemployment Compensation Comm'n*, 118 Vt. 196, 200, 104 A.2d 915, 917 (1954). The essence of the distinction at common law has always been the right to control the details of the performance — the right to specify the means and methods used in the performance of the work — rather than simply the result. *Rich v. Holmes*, 104 Vt. 433, 437, 160 A. 173, 174 (1932); *Thomas v. United States*, 204 F. Supp. 896, 898 (D. Vt. 1962). However, the control or direction element of the statutory ABC test is not the same as the common law "control" test for independent contractors. *Vt. Inst. of Cmty. Involvement*, 140 Vt. at 100, 436 A.2d at 768. Our case law tells us that the common law master-servant doctrine does not resolve the issue. *Stevens*, 116 Vt. at 398, 77 A.2d at 847.

¶ 12. For example, the Court found that adjunct faculty members at a college were "employees," even though the faculty members developed their own course descriptions, set the time and place of instruction, rarely taught at a location provided by the employer, and were paid based on the number of students enrolled in their classes. *Vt. Inst. of Cmty. Involvement*, 140 Vt. at 98-99, 436 A.2d at 767. The college's practice of approving course descriptions and requiring (1) a minimum number of hours for each class, (2) written evaluations of the students at the end of each course, and (3) attendance at a few meetings during the school year were sufficient indicia of control to defeat the college's reliance on the ABC test. *Id.* There was no discussion of the manner and means of the "performance" of their teaching tasks.

¶ 13. To support its position that the control test in part A is essentially the common law master-servant test, FOE cites *Athol Daily News v. Board of Review of Division of Employment & Training*, 786 N.E.2d 365 (Mass. 2003), in which the newspaper employer appealed from the Board's finding that newspaper deliverers were eligible for unemployment compensation benefits. There, the Massachusetts Supreme Judicial Court, examining a similar ABC statutory test, noted that, "notwithstanding that the worker could be considered an independent contractor under common law, the worker may still be deemed an employee for purposes of [the statute]." *Id.* at 371 n.10. However, it went on to hold that the newspaper did not exercise control and direction over the carriers' delivery of newspapers. "The record demonstrates that the carriers pick up and deliver the newspapers however they wish." *Id.* at 371. We reached the opposite conclusion in *Times-Argus Ass'n v. Department of Employment & Training*, 146 Vt. 320, 503 A.2d 129 (1985), as is discussed below.

¶ 14. Similarly, FOE relies on *Carpet Exchange of Denver, Inc. v. Industrial Claim Appeals Office*, 859 P.2d 278 (Colo. Ct. App. 1993), for its claim that the common law control test for distinguishing servants from independent contractors should apply. While recognizing that the definition of employment under the Colorado Employment Security Act was broader than the common law master-servant relationship, *id.* at 281, the Colorado Court of Appeals held that the fact that floor plans or diagrams were given to carpet installers did not amount to general control over the means of doing the work, but rather defined "the job to be done or the result to be accomplished." *Id.* After considering other job requirements imposed by the employer, the court found that carpet installers were free from control and direction of the carpet retailer over the means and methods of their work. *Id.* at 282.

¶ 15. In contrast to a carpet retailer who pays workers to install its product, FOE's only business is designing and selling hand-made children's clothing, and this business cannot be conducted without the services performed for it by the home knitters and sewers. Every piece of clothing sold by FOE is produced by the home knitters and sewers. At the hearing before the Board, the owner of FOE was asked, "If these people weren't doing this knitting for you, what would your business be?" to which she answered, "I guess I would be retailer selling — goodness, I don't know."

¶ 16. This Court liberally construes part A of the ABC test. In *In re Bargain Busters, Inc.*, salesmen hired by a company to sell advertising space in a weekly paper were paid a commission on advertising. They

signed an agreement with the company, the terms of which provided that the agent "represent[ed] him/herself as an independent sales agent and, in no manner whatsoever [was] to be considered as an employee or agent of the 'Shopper' and therefore [was] not covered by Federal Social Security or State Unemployment Acts or any other benefits normally associated with that of an employee." 130 Vt. 112, 113, 287 A.2d 554, 556 (1972). The salesmen were not required to work regularly but could "spend as much, or as little, time as their ambition dictates." *Id.* at 114, 278 A.2d at 556-57. We held that "the salesmen were performing personal services for remuneration" and that the facts appearing in the employment contract and the evidence concerning the entire relationship between the company and salesmen justified a finding of control within the meaning of part A. *Id.* at 117, 287 A.2d at 558.

¶ 17. The Unemployment Compensation Act seeks to protect workers and envisions employment broadly. The degree of control and direction over the production of a retailer's product is no different when the sweater is knitted at home at midnight than if it were produced between nine and five in a factory. That the product is knit, not crocheted, and how it is to be knit, is dictated by the pattern provided by FOE. To reduce part A of the ABC test to a matter of what time of day and in whose chair the knitter sits when the product is produced ignores the protective purpose of the unemployment compensation law.

¶ 18. Amici argue that in our modern economy independent contractors serve a variety of functions that are not easily performed by employees. They are a resource for owners of small businesses who need to hire someone with a skill that is needed by the business for a short period of time or on an occasional basis. While true, this description does not describe the workers FOE employs to create the only products FOE sells. The business needs these skills continually, not on an occasional basis. These workers are fundamental to the business.

¶ 19. Other jurisdictions have concluded that industrial home workers, in the garment industry and otherwise, are subject to the control or direction of their employers and are covered by unemployment compensation laws. One of the earliest reported cases is *Andrews v. Commodore Knitting Mills, Inc.*, 13 N.Y.S.2d 577 (App. Div. 1939). There the New York court found that workers knitting garments in their homes using the employer's raw materials and the workers' equipment were employees because "some supervision [was] exercised over the workers by [the employer], such as the manner in which the work [was] to be performed coupled with the right of [the employer] to

hire and discharge the workers." *Id.* at 578. The court rejected the argument that the home workers were independent contractors because they were "not subject to supervision at all times," noting that the "very nature of the work [did] not permit constant supervision." *Id.*

¶ 20. The Supreme Court of Illinois reached the same result not long after *Andrews.* In *Peasley v. Murphy*, the court found control or direction over home sewers where they used the employer's materials and had to work at a particular pace. 44 N.E.2d 876, 879 (Ill. 1942). Again, the lack of complete supervision did not change the result as "the nature of their work precluded" such supervision. *Id.* at 880.

¶ 21. Today, the image of an employee is not the same as it was when the unemployment compensation law was enacted. The demands of parenthood, communications-technology advances, issues of energy consumption, and other circumstances have created a new type of employee — one who works from her home or car, enjoying flexibility in the time and place of performance. Presumably, these employees can do their work in bed, while talking with a friend or while watching TV, circumstances that, FOE contends, defeat any argument that it controls the performance of the knitters' work. The argument is overbroad, as it would remove from unemployment coverage all workers who work in their homes or have discretion over their schedules. When knitters knit a sweater for FOE, they perform a unique job for one certain company. They are employees producing the specific product the company sells under the direction and control of FOE. Thus, the Board's decision is consistent not only with the statute and this Court's precedents, but also with the remedial purpose of the unemployment laws. The Board's decision that FOE cannot satisfy part A of the ABC test is reasonable, and we affirm.

¶ 22. As an aside, we note that in *Times-Argus Ass'n* this Court affirmed the Board's assessment of unemployment compensation contributions for rural route delivery drivers based on part B of the test rather than part A. 146 Vt. at 323-24, 503 A.2d at 131. The newspaper claimed that the services performed by the drivers were not "employment" within the meaning of the Unemployment Compensation Act. We noted the lack of any evidence to support the employer's assertion that the delivery or distribution of its newspapers was outside the usual course of its business, part B of the ABC test, and affirmed the Board's conclusion that "there [was] no question but that [employer's] business [was] the publication, circulation and distribution of a newspaper." *Id.* Applying this Court's interpretation of part B to the

case before us, it would seem that the service performed by the home knitters and sewers is not "outside the usual course of the business for which such service is performed." On the contrary, it is *the* key component of the apparel business for which the service is performed. See *Vt. Inst. of Cmty. Involvement*, 140 Vt. at 99, 436 A.2d at 767. Because we affirm as to part A we need not decide the case on part B; we merely note here that these cases suggest that FOE might not meet part B either.

## III.

¶ 23. Notwithstanding the fact that affirmation of part A of the ABC test resolves the question, we discuss the Board's conclusions concerning part C of the test to further inform this decision.

¶ 24. Part C addresses whether the worker is "customarily engaged in an independently established trade, occupation, profession or business." 21 V.S.A. § 1301(6)(B)(iii). The Board upheld the ALJ's finding that two of the workers in question were not so engaged, primarily because one of them worked as an employee for another Vermont company that contracts out its sewing, and another worked forty hours a week as a respite care worker.[1] The Board found that FOE failed to present evidence that these two workers were engaged in independent trade. The Board adopted the ALJ's findings of fact on this point. The ALJ found that the individuals working for FOE had all invested significant sums in the equipment they used and that they "owned the equipment prior to any contact with FOE." Despite these capital investments, the ALJ concluded, and the Board agreed, that these workers could not have their own businesses if they were also forty-hour-a-week employees for other entities.

¶ 25. We question this logic. Nothing in the statute requires the workers to be engaged full-time in their independent business or trade. See 21 V.S.A. § 1301(6)(B)(iii). Indeed, there is no evidence regarding the number of hours that the other workers devoted to their knitting and sewing for FOE, or whether they had other employment in addition to their knitting and sewing work. Furthermore, the presumption that there are only forty hours available in every work week

---

[1] As noted above, the Board's decision concerned a third worker who also did not pass part C. On appeal FOE does not appear to contest this aspect of the Board's determination, and therefore, the Court will not address the evidence as to this worker.

ignores the fact that many people work more than one so-called "full-time" job simply to make ends meet.

¶ 26. More importantly, the section requires workers to be "independently established providing the same or similar services as they provide for the employer." *Vt. Inst. of Cmty. Involvement*, 140 Vt. at 100, 436 A.2d at 768. Respite care work is not similar to the work done for FOE, and it was error for the Board to consider it in deciding this issue. Further, the evidence that this worker owned her own equipment and had knitted for other companies and individuals in the past is evidence that she would meet part C of the test. The ALJ found that the second worker had done contract sewing similar to the contract sewing she does for FOE. Rather than disqualifying her from being engaged in independent business, this information tends to show that she is by trade a seamstress and, therefore, that she too would meet part C of the test. While the Court owes deference to the Board, we are not bound by an erroneous construction of the law. *Bouchard*, 174 Vt. at 589, 816 A.2d at 510. We would hold that the facts as found by the Board regarding these two women would satisfy part C of the test. However, because the ABC test is conjunctive, this holding is not dispositive.

¶ 27. The employer bears the burden of proof, and FOE's failure to demonstrate that it does not exercise direction and control in the performance of the work suffices to establish that the services in question constitute "employment" within the meaning of unemployment compensation law. The decision of the Board is affirmed.

¶ 28. As noted above, our perception of the work week and the work place have changed significantly since the language of the ABC test was crafted seventy-one years ago. The legislative attempt to draw a distinction between employees and independent contractors may have sufficiently covered existing practices when the statutes were enacted, but given the current multiplicity of working relationships, it is extremely difficult to fashion a single test by which every worker's status can be determined. It may be that the ABC test no longer appropriately protects workers without unfairly burdening employers and hindering flexible employment practices. For example, part B, that the workers do not work in the employer's usual place of business, would appear to be meaningless in today's telecommuting world. The Legislature long ago drafted a benevolent statute to protect workers. If that statute now limits opportunity for workers, it is up to the Legislature to decide whether the statute should be adjusted to accommodate current employment trends.

*Affirmed.*

¶ 29. **Burgess, J.,** dissenting. The majority extends the unemployment compensation law to abolish independent contracting from the manufacture of specified goods regularly produced for retail sale. It is now declared that persons working entirely on their own, free from all control and supervision by a company, are "employees" of that company simply because they make a product that the company orders, pays for, and resells. I dissent because this is not what the statute says or intends. Instead, the ABC test expressly recognizes and allows that an employment relationship can be exempt from the unemployment tax at a point, defined by the statute, when the person employed works independently from the business. Contrary to the Employment Security Board's conclusion that the home workers in this case were employees, now erroneously confirmed by the majority, the findings of fact below demonstrate that the business met all three elements of the ABC test and that the workers were independent contractors not covered by the law. The Board's judgment should be reversed.

¶ 30. There is no disagreement that parts B and C are satisfied with respect to these workers. The Board correctly determined that their work at home met the part B definition of services performed outside FOE's place of business. The Board's misunderstanding, that two of the workers could not be considered "customarily engaged" in an independent trade under part C if they had some other primary employment, is corrected by the majority's proper construction of part C to recognize that a worker can be regularly engaged in a home trade on a part-time basis, or even while working in another occupation or for another employer.

¶ 31. The facts underlying the employment relationship between FOE and these workers equally satisfied the status of independent contractors as required under part A of the test. Essentially, although the employer would supply the material and patterns, and reserved the right to reject noncomplying products, these knitters and sewers worked at home, on their own equipment, as and when they pleased, and without any supervision or direction whatsoever over their performance. That FOE specified what it wanted and agreed to pay only for what was specified, does not make the workers its employees, lest every artificer of tailor-made or specified goods be rendered an employee of those who order particular products. It is long settled that when one party hires another to perform a task, but "may specify the result only, and the latter may adopt such means and methods as he chooses to accomplish that result, then the latter is not an employee,

but an independent contractor." *Kelley's Dependents v. Hoosac Lumber Co.*, 95 Vt. 50, 53, 113 A. 818, 820 (1921).

¶ 32. This status is not changed by frequency or volume of production, which are not elements of part A, or of parts B or C, and the fact that FOE supplies material and patterns to the home workers is equally irrelevant.[2] The material and patterns were one in the same as the goods, or result, to be produced. Neither specification controlled or directed the "performance of such services" as described in part A, 21 V.S.A. § 1301(6)(B)(i), any more than ordering a tailor-made skirt in a particular plaid, or requiring that building or cabinetry be completed according to blueprints, controls or directs the worker's performance. See *Carpet Exch. of Denver, Inc. v. Indus. Claim Appeals Office*, 859 P.2d 278, 281-82 (Colo. Ct. App. 1993) (holding that plans and diagrams for carpet installation defined the job or result to be paid for, and did not amount to control and direction of the job as would convert the jobbers into employees under part A).

¶ 33. The majority reminds us that, in keeping with the remedial purpose of the unemployment compensation law, the "statutory scheme at issue here is broader than the common law" and "draws into its sweep workers who might be independent contractors under the common law." *Ante,* ¶ 11. No doubt "[i]t is plain from its terms that the three concomitant conditions [of the ABC test] bring under the definition of 'employment' many relationships outside of the common law concepts of the relationships of master and servant." *State v. Stevens*, 116 Vt. 394, 397-98, 77 A.2d 844, 847 (1951). Thus, workers who could qualify as independent contractors at common law are nevertheless covered employees under the unemployment law unless they work outside of the employer's course of business or workplace, and are customarily engaged in an independent vocation as provided by the accompanying conditions of parts B and C. 21 V.S.A. § 1301(6)(B)(ii), (iii).

¶ 34. That is not to say, however, that what is commonly termed an employer-employee relationship, or what used to be called a "master-servant" relationship at common law, is not also the basic component of

---

[2] While not addressed in a finding of fact by the Board, it appears to be undisputed that none of the home workers were required to precisely follow the patterns supplied by FOE. One elected to use the pattern, while two did not. Two others had the pattern in mind, but adjusted it to suit their own knitting styles.

part A of the ABC test.[3] Considering the same language as that in Vermont's part A, the Massachusetts Supreme Judicial Court explained in *Athol Daily News v. Board of Review of Division of Employment & Training* that "[t]his provision generally was construed according to the common-law analysis of master and servant relationship." 786 N.E.2d 365, 371 (Mass. 2003) (citing *Brigham's Case*, 202 N.E.2d 597, 598 (Mass. 1964), for the proposition that "[i]f in the performance of his work an individual is at all times bound to obedience and subject to direction and supervision as to details, he is an employee; but if he is only responsible for the accomplishment of an agreed result in an agreed manner, he is an independent contractor."). Courts may debate the degree of control contemplated by the statute, but, as Benjamin S. Asia observed, while each part of the ABC test is distinctly significant and the test, as a whole, defines employment far more broadly than at common law, "[b]y and large, the courts have not seemed to give [part A] a very different meaning than they would have the common-law control test." *Employment Relation: Common Law Concept and Legislative Definition*, 55 Yale L.J. 76, 86, 91 (1945) (cited with approval in *Stevens*, 116 Vt. at 398, 77 A.2d at 847).

¶ 35. In any event, the cases cited by the majority in support of expanding the statute are inapposite or immediately distinguishable. Reacting to the employer's argument that its home knitters were not employees under part A because they were not supervised "at all times," the court declared in *Andrews v. Commodore Knitting Mills, Inc.* without description, that "[i]t appears definitely in this case that *some* supervision is exercised over the workers by [the mill], such as

---

[3] The majority cites several cases from other jurisdictions which, like our own, confirm that the unemployment compensation law applies to more than the traditionally recognized employer-employee relationship. These holdings, however, are not in reference to part A, but are based on the entire ABC test. See *Stevens*, 116 Vt. at 400, 77 A.2d at 848 (declining to reach part A, when employer failed to meet the criteria of parts B and C); *Carpet Exch. of Denver*, 859 P.2d at 281 (making this distinction clear when it states that "although the definition of employment under the . . . Act is broader than the common law master-servant relationship, the freedom from control requirement of [part A] is derived from the common law control test for distinguishing servants from independent contractors." (citations omitted)). Other jurisdictions agree that "part A is 'no more than an adoption of the common-law control test,' which classifies as an independent contractor one who renders services but retains control over the manner in which those services are performed, agreeing only to accomplish results." *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 593 A.2d 1177, 1185 (N.J. 1991) (quoting Comment, *Interpretation of Employment Relationship Under Unemployment Compensation Statutes*, 36 Ill. L. Rev. 873, 877 (1942)).

the manner in which the work is to be performed . . . ." 13 N.Y.S.2d 577, 578 (App. Div. 1939) (emphasis added). Homeworkers for a neckwear manufacturer in *Peasley v. Murphy*, 44 N.E.2d 876 (Ill. 1942), were determined not to be free from the control and direction of their employer, as set forth in part A, when they were required to work at a minimum speed, to abide by "rush" orders and deadlines, and to pay for spoiled merchandise. *Id.* at 879. In contrast, the workers in the instant case had no deadlines, no minimum hours, no special orders, and were not supervised or controlled at any time by FOE. Moreover, the statutory schemes in both *Andrews* and *Peasley* expressly included "industrial homework" within the definition of covered employment,[4] a particularly broader version of the law not adopted by our Legislature, by virtue of which both courts agreed that such workers were not exempted from the law's reach as independent contractors. *Id.*; *Andrews*, 13 N.Y.S.2d at 579. Unlike the adjunct faculty found subject to at least a modicum of control by the employing college in *Vermont Institute of Community Involvement, Inc. v. Department of Employment Security*, 140 Vt. 94, 98-99, 436 A.2d 765, 767 (1981), FOE did not require the homeworkers here to attend any meetings, to work minimum hours, to design any work or to submit any reports.

¶ 36. Although we broadly interpret the control factor in part A to mean "general control and the right to control . . . even though it is not exercised," *In re Bargain Busters, Inc.*, 130 Vt. 112, 117, 287 A.2d 554, 558 (1972) (quotations omitted), FOE neither exercised nor enjoyed any right to exercise control over the homeworkers in this case. Unlike the salespeople selling ad space for a weekly paper, and ascertained to be employees in *Bargain Busters* when they contracted to "strictly adhere" to the employer's procedures and were obligated to not sell advertising for others in competition with their employer, *id.* at 113-14, 287 A.2d at 556, FOE imposed no such strictures on the homeworkers in this case. There is even less employer involvement here than in *Athol Daily News*, where newspaper carriers were found to be independent contractors in charge of their own deliveries, unfettered by the employer's control and direction under part A, despite the

---

[4] "Industrial homework" was defined in New York labor law as the "manufacturing in a home . . . with material which has been furnished by an employer, of any article or articles to be returned to the said employer." *Andrews*, 13 N.Y.S.2d at 578. "Industrial home work" was defined in Illinois as "the processing in a home . . . of any article or articles, the material for which has been furnished by an employer." *Peasley*, 44 N.E.2d at 877.

business setting the route and a deadline for delivery. 786 N.E.2d at 371. Like the carpet installers found to be free of the employer's control under part A in *Carpet Remnant Warehouse*, 593 A.2d at 1185, these homeworkers were free to accept or reject the work offered, could work as little or as much as they wished, and were free to work for others.

¶ 37. Similarly, carpenters paid by the hour to remodel a house according to design choices and changes made during construction by the owner, who also supplied the materials and retained the right to approve of the work and to require the carpenters to work faster, were not the owner's employees under part A in *Johnson v. Montana Department of Labor & Industry*, 783 P.2d 1355, 1358 (Mont. 1989). The Montana court explained that the owner's right to order *what* he wanted done was not the right to control *how* it was done. *Id.* at 1359. This analysis echoes the same common-sense distinction, recognized above in *Kelley's Dependents*, 95 Vt. at 53, 113 A. at 820, and in *Carpet Exchange of Denver*, 859 P.2d at 281-82, that contracting for a particular product, or result, is not the same as controlling performance of work as contemplated by part A of the test.

¶ 38. To bolster its extension of the statute to unsupervised and independent workers, the majority proposes that no one may be an independent contractor exempt under part A of the ABC test, if the worker produces goods for a retail business on an ongoing basis. *Ante,* ¶¶ 15, 17. Thus every artisan — be she jeweler, baker, lathe operator, glassblower, potter, truck farmer or eggroll purveyor — becomes the employee of the shop or enterprise that buys her product for resale. Perhaps the majority imagines that the material supplied by the business is, or should be, the distinguishing factor, as in jurisdictions with "industrial homeworker" statutes. If so, Vermont has not adopted such legislation; the provision of material to be used is no different than specifying that whatever product is ordered must be made of oak, silk, or be colored red; and this factor is nowhere an element of part A, or of any part, of the ABC test. What the majority promotes is simply not what the statute says, and purports to supersede the test expressed in part A: whether the worker "has been and will continue to be free from control or direction over the performance of such services" for which the person is paid. 21 V.S.A. § 1301(6)(B)(i). The majority either rewrites part A, or tacks on a new "part D" to the ABC test — neither of which were evidently intended by the Legislature.

¶ 39. The majority's reasoning is unsound for at least four reasons. The first is that it ignores the independent-contractor status recognized

by part A of the ABC test. Second, the majority's continuous-supply-of-product-to-retailers-test as a criterion for covered employment conflicts with, and eliminates, part B of the test, which expressly exempts work within "the usual course of the business for which such service is performed," provided it is "performed outside of all the places of business of the enterprise for which such service is performed." *Id.* § 1301(6)(B)(ii). Third, the majority's confusion or conflation, or both, of the product to be made with control of the performance in making it, cannot but eliminate part A from the ABC test since every specification of a product to be made and paid for must, by the majority's logic, constitute control over performance of the work. Finally, the majority's extension of the statute in this manner makes the law practically identical to legislation governing "industrial homeworkers," like those enacted by Illinois and New York, when that legislation has not been passed in Vermont.

¶ 40. We should exercise "[g]reat care ... not to expand proper construction of a statute into judicial legislation." *Harris v. Sherman*, 167 Vt. 613, 614, 708 A.2d 1348, 1350 (1998) (mem.) (quotations omitted). Ordinarily, we enforce a statute according to its terms when its meaning is plain on its face, *State v. Laclair*, 161 Vt. 585, 587, 635 A.2d 1200, 1204 (1993) (mem.), and avoid constructions that render significant parts of a statute pure surplusage. *Robes v. Town of Hartford*, 161 Vt. 187, 193, 636 A.2d 342, 347 (1993). Even liberal construction of remedial legislation, like this law, "does not allow us to stretch the language beyond legislative intent." *Elkins v. Microsoft Corp.*, 174 Vt. 328, 331, 817 A.2d 9, 13 (2002). The majority opinion disrupts and fails to give effect, as we should, to parts A and B of the ABC test as written. See *State v. Tierney*, 138 Vt. 163, 165, 412 A.2d 298, 299 (1980) ("In construing a statute, this Court considers it as a whole, and, if possible, gives effect to every word, clause and sentence."). Instead, the majority transforms the unemployment compensation law into different legislation from what was enacted by the Legislature.

¶ 41. Accordingly, I dissent and am authorized to state that Judge Eaton joins in this dissent.