THOMAS G. DRISCOLL, JR. *vs.* WORCESTER TELEGRAM
& GAZETTE & another.[1]

No. 07-P-344.

Worcester. January 8, 2008. - September 25, 2008.

Present: KANTROWITZ, TRAINOR, & VUONO, JJ.

*Employment Security,* Employment relationship, Judicial review.

A District Court judge properly reversed a decision by the board of review of
the division of unemployment assistance denying the plaintiff newspaper
carrier unemployment compensation benefits because no employment
relationship existed between the plaintiff and the defendant newspaper
publisher, where the defendant controlled virtually all aspects of the services
that the plaintiff provided, such that he qualified as an employee within the
meaning of G. L. c. 151A. [712-718]

CIVIL ACTION commenced in the Gardner Division of the Dis-
trict Court Department on October 12, 2004.

The case was heard by *Patrick A. Fox,* J.

*Jeffrey J. Corradino* (*Robert H. Morsilli* with him) for the
defendant.

*James M. Galliher* for the plaintiff.

VUONO, J. The question raised in this appeal is whether the
plaintiff, Thomas G. Driscoll, Jr., a news carrier who delivered
newspapers for defendant Worcester Telegram & Gazette
(WT&G), should be considered an independent contractor or an
employee for purposes of receiving unemployment benefits
under G. L. c. 151A.

*Procedural background.* In July, 2003, Driscoll filed a claim
for unemployment benefits. The Division of Unemployment
Assistance[2] (DUA) denied his claim because it determined that

---

[1]Commissioner of the Division of Unemployment Assistance, who has
elected not to participate in this appeal.

[2]Driscoll filed his complaint with the DUA under its former name, the Divi-
sion of Employment and Training.

no "employer-employee relationship" existed between Driscoll and WT&G. That decision was upheld by a DUA review examiner following an evidentiary hearing, and ultimately affirmed by the DUA board of review (board). Driscoll then sought judicial review pursuant to G. L. c. 151A, § 42.[3] A District Court judge concluded that Driscoll was an employee within the meaning of G. L. c. 151A, and reversed the board's decision.[4] This appeal by WT&G ensued. After a careful review of the record, we are persuaded that WT&G exercised a sufficient degree of control over Driscoll's performance such that he should be considered an employee within the meaning of G. L. c. 151A. Accordingly, we affirm the judgment of the District Court.[5]

*Facts.* The following facts are derived from the board's findings and additional undisputed evidence in the record. WT&G publishes a daily newspaper and is also a distributor of more than eight major newspapers including the New York Times, the Wall Street Journal, and the Boston Globe.[6] Driscoll worked as a WT&G newspaper carrier for twenty-one years. Each carrier was required to sign a contract entitled "home delivery service agreement" before obtaining a delivery route.[7] Under the terms

---

[3]At the request of the commissioner of the DUA, the case initially was remanded to the board for additional findings. Thereafter, the board made additional findings based on the testimony previously heard by the review examiner and subsequently affirmed its earlier determination.

[4]According to Driscoll, the commissioner of the DUA submitted a memorandum of law in the District Court on May 15, 2006, in which he asserted that WT&G had failed to meet its burden under G. L. c. 151A, § 2(*a*) and (*b*). He stated that the board's conclusions to the contrary were not supported by substantial evidence and were based upon errors of law. WT&G does not contend otherwise.

[5]Driscoll's cross appeal from the order permitting WT&G to docket its appeal late was consolidated with WT&G's appeal. The District Court judge did not abuse his discretion in permitting WT&G to docket its appeal thirteen days late. The reasons for the delay as set forth by WT&G's counsel in his affidavit submitted in support of the motion were sufficiently compelling to warrant allowing the motion. See Mass.R.A.P. 10(a)(3), as amended, 378 Mass. 937 (1979); *Larabee* v. *Potvin Lumber Co.*, 390 Mass. 636, 638-639 (1983). In any event, it appears that WT&G's appeal timely was filed with respect to when judgment entered on the docket.

[6]The record indicates that, within its subscription area, WT&G, a subsidiary of the New York Times, maintained exclusive delivery of all but two small afternoon newspapers, the Athol Daily News and the Fitchburg Sentinel.

[7]The contract consists of four pages plus an attached two-page schedule. The

of the contracts for each of his three routes, Driscoll agreed to deliver the papers at a time designated by WT&G[8] and "in a manner satisfactory to each recipient, at locations specified by each recipient and in a manner that protected the product before and after delivery from theft and damage." The contract described Driscoll's status as that of an independent contractor.[9]

The contract between Driscoll and WT&G also specified Driscoll's method of compensation. WT&G's carriers did not purchase and resell the papers; WT&G retained ownership of the product until it was delivered to the customer. WT&G established the amount of payment for delivery of each type of newspaper based on the length and complexity of the route. The contract provided that carriers were to be paid on at least a biweekly basis, whether or not a customer had paid WT&G.

WT&G employed district managers who were responsible for supervising the carriers on a daily basis. The board found that "[t]he district manager's duties included oversight of the carriers, providing them with support they needed to carry out their responsibility, making sure that newspapers were delivered everyday as required by the publisher and as requested by the customers, and responding to customers' complaints." District managers spent several days on the route training each new carrier and were authorized to go out on the route to determine if the carrier was complying with the delivery order, to "observe whether the carrier has done his or her job to [WT&G's] or to the customer's satisfaction," and to investigate customer complaints. The district

---

contract was for a six-month term, automatically renewable, and prohibited assignment. It allowed the carrier to terminate the agreement at any time, with fourteen days' written notice, and provided that WT&G could terminate the agreement upon thirty days' written notice prior to the renewal date. The contract also allowed either party to terminate the contract "effective immediately" upon written notice of a breach of the contract provisions.

[8]The carriers were required to complete delivery before 6:30 A.M., Monday through Saturday, and before 7:30 A.M. on Sundays.

[9]Throughout the contract, the carrier is referred to as "IC." The carrier is described as "engaged in the independent business of delivering publications and other products." Paragraph 7 of the contract, detailing the "IC's Status," states that the IC is "a self-employed, independent contractor, not an employee of [WT&G]." The paragraph further provides that "IC shall have the right to operate IC's business as IC chooses. . . . The manner and means employed by IC are matters entirely within the authority and discretion of IC." But see *Boston Bicycle Couriers, Inc.* v. *Deputy Director of the Div. of Employment & Training*, 56 Mass. App. Ct. 473, 484 (2002).

manager maintained an office at the distribution center for that district, and gave the carriers additional instructions there whenever the district manager deemed such instructions necessary.

WT&G carriers, or their designees, were required to pick up the newspapers, so-called "bundle labels," and other items for delivery, such as product samples, at a WT&G distribution center. The bundle labels contained written instructions and information for the carrier, such as notice of new customer set-ups, service terminations, when to suspend delivery for a particular customer and for how long, customer complaints, and any special requests, including where to place the paper and what path to travel on the customer's property. WT&G used customer complaints as a method of monitoring carrier performance. WT&G established acceptable "complaint levels" per one thousand papers delivered. Failure to follow instructions on the bundle labels, or exceeding WT&G's established complaint levels, could result in redress charges that were deducted from the carrier's compensation without prior notification.

Once the carrier decided upon the initial order of delivery, the carrier had to submit a "delivery order list" to WT&G, and WT&G thereafter required the carrier to deliver the newspapers in that order. WT&G could change the route or the papers to be delivered, after giving fourteen days' advance notice, and the carrier could accept the change or relinquish the route. WT&G retained the right to require carriers to deliver to some customers before others. WT&G also required its carriers to obtain approval before giving customers notices concerning future deliveries of papers. Furthermore, WT&G required that it be notified in writing, in advance, of any delegated substitute carrier and the period of delegation, "except in the case of an extreme emergency." "In practice [WT&G] prohibited the use of substitutes with a prior history of unacceptable delivery services."

*Discussion.* "We review the decision of the board according to the standards set forth in G. L. c. 30A, § 14(7), giving 'due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.' " *Commissioner of the Div. of Unemployment Assistance* v. *Town Taxi of Cape Cod, Inc.*, 68 Mass. App. Ct. 426, 428 (2007) (*Town Taxi*), quoting from *Athol Daily*

*News* v. *Board of Review of the Div. of Employment & Training,* 439 Mass. 171, 175 (2003).

Pursuant to G. L. c. 151A, § 2, an employment relationship exists unless "the services at issue are performed (a) free from control or direction of the employing enterprise; (b) outside of the usual course of business, or outside of all the places of business, of the enterprise; and (c) as part of an independently established trade, occupation, profession, or business of the worker," i.e., the so-called "ABC" test. *Id.* at 175-176. If an employer fails to establish any one of the criteria, the services constitute "employment" within the meaning of G. L. c. 151A. *Coverall N. America, Inc.* v. *Commissioner of the Div. of Unemployment Assistance,* 447 Mass. 852, 857 (2006). Where a written contract exists between the parties, "a reviewing court [is required] to look beyond the four corners of the agreement to the actual working relationship" to determine whether an employer has satisfied its burden. *Boston Bicycle Couriers, Inc.* v. *Deputy Director of the Div. of Employment & Training,* 56 Mass. App. Ct. 473, 484 (2002).

WT&G contends that the board correctly determined that it had satisfied prong (a) of the ABC test. In reaching its conclusion, the board relied on *Athol Daily News.* In that case, the Supreme Judicial Court analyzed the same issue presented here, that is, whether the carriers who delivered newspapers for the Athol Daily News (News) were independent contractors or employees eligible for unemployment compensation benefits. See *Athol Daily News, supra* at 171-172. The court described the News as a small newspaper company that published a local newspaper six days a week and employed twelve adult carriers. *Id.* at 172. Each carrier entered into an "Independent Newspaper Carrier Agreement" requiring him to deliver the newspapers "in good condition" and before a certain time each day. *Ibid.* The court concluded that because the carriers were otherwise "entirely free from [News's] supervision in performing the services for which they were engaged," *id.* at 178, the News had met its burden under prong (a) of the ABC test, *id.* at 176-178.

In reversing the board's decision here, the District Court judge concluded that *Athol Daily News* is distinguishable be-

cause the degree of control and supervision that WT&G exercised over Driscoll far exceeded that which was present in *Athol Daily News.*[10] "The question before the judge and before us is one of law, whether, on the undisputed facts, . . . [WT&G] has demonstrated that [Driscoll was an] independent contractor[] under the ABC test." *Id.* at 176. In making this determination, "we are required to construe G. L. c. 151A liberally, in view of its overriding purpose 'to lighten the burden which now falls on the unemployed worker and his family.' " *Id.* at 174, quoting from G. L. c. 151A, § 74. We conclude that WT&G failed to satisfy prong (a) of the ABC test.

The board determined that WT&G did not retain control of the carriers' performance because it did not specify "the manner of delivery or the method to ensure prevention of theft or damage." That conclusion, however, is not supported by the record. On the contrary, WT&G controlled virtually all aspects of the services provided by Driscoll. The board's findings demonstrate that WT&G retained control over its carriers' routes by requiring that each carrier provide a list of the delivery order and continue to deliver the newspapers in that order. WT&G's control of the routes included the right to require carriers to deliver to some customers before others, and to change the routes or papers to be delivered.

Furthermore, the district manager directly supervised the new carriers and retained the authority to go on the route to determine if the carrier was performing his job to WT&G's and the customers' satisfaction. WT&G required its carriers to modify

---

[10]We reject WT&G's argument that the judge engaged in improper fact finding. The judge properly examined the entire record, as we have, to determine if the board's findings were supported by substantial evidence, and also correctly considered "whatever in the record fairly detracts from [the] weight" of the evidence. *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981), quoting from *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966). That the record contains some evidence from which a rational mind might draw an inference in support of the agency conclusion does not dispose of the reviewing court's inquiry. *New Boston Garden Corp.* v. *Assessors of Boston*, *supra*. Furthermore, we note that a number of the board's so-called "findings of fact" are, instead, legal conclusions, and the judge properly treated them as such. Moreover, we agree with the judge's determination that several of the board's findings of fact are not supported by evidence in the record, and that a number of the board's findings are self-contradictory.

their performance to satisfy a customer, and could discharge a carrier because of customer complaints. Contrast *Town Taxi*, 68 Mass. App. Ct. at 427-428, 430 (taxicab drivers who were free to choose shifts that they worked, to pick up their own customers without any request from dispatcher, and to refuse to respond to calls from dispatcher requesting that they pick up particular fares were not subject to company's direction and control, and thus were independent contractors under G. L. c. 151A, § 2).

Other undisputed facts support the conclusion that Driscoll was an employee and further distinguish the circumstances in this case from those in *Athol Daily News*. WT&G reserved the right to demand additional services from its carriers, such as delivering product samples or installing delivery tubes. The publisher in *Athol Daily News* had no such right. See *Athol Daily News*, 439 Mass. at 172-174. WT&G carriers did not own the newspapers, which remained the property of WT&G, nor could they sell the papers at a price higher than that established by WT&G. WT&G's customers paid WT&G directly and WT&G paid the carrier, after deducting all fees and redress charges, for all customers on the route, regardless of whether a particular customer had paid WT&G. The News carriers, on the other hand, purchased the papers from the publisher and had the right to set their own price per newspaper, and if the customer paid the publisher directly, the News refunded the carriers once the customer had paid the publisher.[11] *Id.* at 173. While the carriers in *Athol Daily News* could deliver the papers "on foot, by bicycle, automobile, motorcycle, or otherwise," *id.* at 178, WT&G required its carriers "to have a reliable motor vehicle."

Additionally, WT&G required that it be notified in writing, in advance, of any delegated substitute carrier and the period of delegation, and prohibited the use of substitute carriers with delivery histories that it did not deem acceptable. WT&G also required its carriers to obtain approval before giving customers notices concerning future deliveries of its papers. No such restrictions on substitutes were imposed on the carriers in *Athol Daily News*. Rather, "[w]ithout approval from the News," the News

---

[11]A minority of News customers paid its carriers directly, and in that case, the carrier paid the publisher the wholesale price of the paper, keeping the difference. *Athol Daily News, supra* at 173.

carriers could "be assisted by anyone in the delivery of the newspapers." *Ibid.*

WT&G claims that the manner in which Driscoll performed his work was up to him, noting that Driscoll was free to decide whether to wrap the papers in plastic or rubber bands, and where to purchase these supplies. While Driscoll retained the right to decide minor matters such as whether to use a rubber band for most of the papers, the record, overall, does not support WT&G's position that the carriers controlled the manner of their performance. For instance, WT&G required its carriers to place the New York Times in plastic bags for delivery, but did not require the carriers to place any other papers in plastic bags, even if the customer requested it. If newspapers accumulated at a delivery address, the carriers were required to pick up the papers and notify the district manager. In addition, the carriers were prohibited from inserting or affixing anything to the product or delivering anything with the product that was not provided by the publisher.

Although, as WT&G emphasizes, its carriers were free to engage in other business activities, including delivering competitors' newspapers, the ability of the carriers to maintain additional employment does not diminish the control WT&G exercised over its carriers' performance. Likewise, the fact that WT&G carriers could choose to expand their routes by soliciting new customers is not demonstrative of a lack of control.[12] In fact, the contract required the carrier to assist in maintaining and increasing circulation of WT&G's products.

WT&G argues that it did not deduct Federal or State income taxes from payments it made to Driscoll, and that it sent him an Internal Revenue Service Form 1099 at the end of each year as though he were an independent contractor. WT&G also notes that Driscoll's Federal income taxes stated that he was self-employed. However, the statute explicitly provides that "[t]he failure to withhold federal or state income taxes or to pay workers compensation premiums with respect to an individual's wages shall not be used for the purposes of making a determina-

---

[12]Although the carriers were free to expand their customer base, testimony in the record established that, in practice, most new customers were obtained through WT&G's sales department.

tion under this section." G. L. c. 151A, § 2, inserted by St. 2004, c. 193, § 28. See *Town Taxi,* 68 Mass. App. Ct. at 430 n.10.

Finally, WT&G contends that the "weight of authority" supports the board's conclusion that Driscoll is an independent contractor. In support of this claim, WT&G points to *Venango Newspapers* v. *Unemployment Compensation Bd. of Review,* 158 Pa. Commw. 379 (1993), in which the Pennsylvania Commonwealth Court held that Venango carriers were independent contractors. Even if this case were controlling and could be considered precedent, the facts here are distinguishable. The Pennsylvania court found that "[t]he only control exercised by [the publisher] was over the territory [the carriers] could cover, the time for picking up the product, and requiring that the [carriers] provide prompt, dependable delivery of the product before 6:30 a.m. each day." *Venango Newspapers* v. *Unemployment Compensation Bd. of Review, supra* at 386. Furthermore, in a subsequent case, *York Newspaper Co.* v. *Unemployment Compensation Bd. of Review,* 160 Pa. Commw. 475 (1993), the same court held that the employer's carriers were employees because they were required to follow a written manifest indicating the route order. *York Newspaper Co.* v. *Unemployment Compensation Bd. of Review, supra* at 481.

Recent cases in other jurisdictions, based on facts similar to those here, also have found that newspaper carriers are employees and not independent contractors. See, e.g., *Antelope Valley Press* v. *Poizner,* 162 Cal. App. 4th 839, 853-856 (2008) (finding that carriers are employees, notwithstanding contract stating that they are independent contractors)[13]; *Kentucky Unemployment Ins. Commn.* v. *Landmark Community Newspapers*

---

[13]The court found the carriers to be employees because the "carriers are required to bag certain of the publications, and to use specific colors in doing so. [Antelope Valley Press (AVP)] permits its customers to dictate where they want the publications placed on their property. Any harm to, or loss of the papers can result in financial loss to the carrier. The carrier must abide by the pick up and delivery times specified in the contract, or face economic consequences. In addition to the financial penalties imposed for failure to abide by these many dictates, failures are also grounds for termination for cause. The use of the many financial penalties, as well as reports of complaints of customers, and the visual surveys to determine whether red and orange bagged papers have been delivered, enable AVP to maintain significant super-

*of Ky., Inc.,* 91 S.W.3d 575, 581 (2002) ("[t]he evidence clearly shows that the workers were controlled by [Landmark] relative to where the newspapers were to be placed, when they were to be delivered, and in what condition. [Landmark] not only retained the right to control, but exercised that control, up to and including termination"). See also *Fleece on Earth* v. *Department of Employment & Training,* 181 Vt. 458, 462-466, 468 (2007) (home knitters and sewers were employees rather than independent contractors because company exercised supervision in providing patterns and material and reserved right to reject particular products).

WT&G's failure to demonstrate that Driscoll delivered newspapers free from its direction and control suffices to establish that the services in question constitute employment within the meaning of G. L. c. 151A, § 2. In view of our disposition of the case, it is not necessary for us to consider whether WT&G satisfied its burden under the remainder of the ABC test. See G. L. c. 151A, § 2.

*Judgment affirmed.*

vision over the carriers. Moreover, AVP has control over the price paid by customers to AVP." *Antelope Valley Press* v. *Poizner, supra* at 853.